*Decision will be entered for the respondent.*

ESTHER LA FARGUE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5629–75, 6259–77.     Filed October 10, 1979.

*Harry Margolis, Richard Gladstein,* and *W. Palmer Kelly,* for the petitioner.

*John E. Lahart, Jeannette A. Cyphers,* and *William E. Bonano,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in the Federal income tax of petitioner for 1971, 1972, and 1973 in

the respective amounts of $3,576.58, $4,052.04, and $3,912 together with negligence penalties under section 6653(a).[1] The negligence penalties have been conceded by respondent, and capital loss adjustments set forth in one notice of deficiency have been conceded by petitioner. There remains at issue whether certain transactions between petitioner and a trust which she established should be treated as constituting a transfer of property in exchange for an annuity in her favor, with the result that the taxation of the payments received by her should be governed by section 72 and other applicable legal principles, or as creating a trust in which petitioner retained the requisite interest under sections 671 through 677 governing trusts where grantors are treated as substantial owners.

A constitutional objection raised by petitioner is no longer an issue before this Court. This matter was disposed of when the Court granted respondent's motion to strike amendments to the petitions herein.[2]

The trial of this case was held before Special Trial Judge Aarons. He prepared a report which was served on the parties and to which they have filed certain exceptions. These exceptions have been taken into account by the Court and appropriate weight has been given to the findings of fact recommended by Special Trial Judge Aarons. See Rule 182(c) and (d), and the Note thereto, Tax Court Rules of Practice and Procedure, 60 T.C. 1057, 1149–1150 (1973).

## FINDINGS OF FACT

Some of the facts have been stipulated and those facts are so

---

[1]Statutory references are to the Internal Revenue Code of 1954, as amended and effective in the years in issue, unless otherwise indicated.

[2]Petitioner's constitutional claim was originally presented in the form of a motion for summary judgment, but with leave of the Court, the motion was withdrawn by petitioner, who was granted permission to embody her constitutional objection in the amendments to her petitions referred to above. In the opening brief in this case, filed after trial and after the Court's order striking the amendments, petitioner's counsel requested that the motion for summary judgment be reinstated.

We are unable to discern any purpose that would be served by such action and petitioner has suggested none. In granting respondent's motion to strike, the Court considered as true facts alleged in an affidavit of petitioner's counsel, which facts together with the amended pleadings provided a factual basis that was more extensive than that which was set forth in the affidavits submitted with petitioner's motion for summary judgment. Thus, the Court having determined that petitioner had failed to state a claim upon which relief could be granted, it follows that the motion for summary judgment based on the same allegations would suffer the same fate. In this context, and in view of the fact that a full trial on the merits has taken place, reinstatement, consideration, and disposition of the motion for summary judgment would be an exercise in futility.

found. The stipulation of facts, supplemental stipulation of facts, and all attached exhibits are incorporated herein by this reference.

Petitioner resided in Los Gatos, Calif., at the time the petitions were filed herein. She filed her Federal income tax returns for the years in issue with the Internal Revenue Service Center, Fresno, Calif.

Anna Bracher Blum, petitioner's mother, died in March 1969 leaving a sizeable estate to her three daughters equally. Petitioner's share amounted to more than $165,000, including stock in a family fruit business (Bracher Fruit Co.), bonds, cash, and other stocks, which was finally distributed in December 1970. Mrs. Blum's death also terminated a testamentary trust created by her husband's will 30 years before. The remainder of the trust was divided equally among petitioner and her two sisters. The final distribution of trust assets to petitioner included bonds and a one-third interest in two parcels of land in San Jose, Calif. One of the parcels was rented to Bank of America for use as a parking lot. The other was an unimproved lot producing no income.

While petitioner was involved in administering her mother's estate, she became concerned about the problems of managing such a large amount of property. Although she had been managing her own property since her husband's death in March 1968, her holdings had not been so extensive. She asked her mother's attorney about the advisability of setting up a trust for her daughter, Emily, and he thought it was a good idea. They did not discuss the matter in detail, since he was from a different city and petitioner did not intend to have him draft the trust documents. During this same period, petitioner was being approached by representatives of life insurance companies who suggested that she purchase an annuity. A friend of her late husband, a securities dealer, also contacted her to discuss an investment plan.

After pondering these alternatives, petitioner tentatively decided to set up a trust and visited her attorney, Harry Margolis. Petitioner and her immediate family had been friends of Mr. Margolis and his family for nearly 20 years, and an informal social relationship existed between them. Petitioner and her husband had executed wills drafted by Mr. Margolis, but

they had never been involved in complex matters in which they required sophisticated legal advice.

Since she was aware that she did not fully understand the relative advantages of the suggestions that she had received, petitioner discussed different arrangements with Mr. Margolis and an associate. After these discussions, she again decided to create a trust and, with the help of Mr. Margolis, went about the task of selecting trustees. She was advised that it would be a good idea to have a member of the family as a trustee, someone who was a friend and contemporary of the beneficiary, and someone who was competent in technically handling the assets of the trust. To fill these roles petitioner chose Maxine Gardner (her youngest sister), Daniel Hawkes (son in a family close to both the La Fargues and the Margolises), and Mr. Margolis. Of the three, only Mr. Margolis was at all experienced in trust administration.

The plan involved two steps: first, creating the trust with a nominal corpus; second, executing a contract with the trustees for annual payments to petitioner in exchange for a large portion of the inherited property.

Petitioner and the chosen trustees executed a trust agreement dated February 10, 1971. Petitioner caused to be delivered $100 to the trustees as the initial corpus. The trust agreement consisted of two parts, a general "Master Trust Agreement" and a "Trust Agreement" with specific terms which modified or deleted portions of the master agreement to meet the needs of petitioner. The specific portion of the document provided as follows:

## TRUST AGREEMENT

This Trust Agreement is entered into this 10th day of February, 1971, by and between ESTHER MARIE LAFARGUE of Los Gatos, California, as Trustor, and MAXINE LOUISE GARDNER, DANIEL HAWKES and HARRY MARGOLIS, as Trustees.

Attached hereto and made a part thereof as if fully set forth herein is a "Master Trust Agreement" consisting of a one (1) page index and thirteen (13) pages of content. Said "Master Trust Agreement" shall apply fully in all respects except as specifically, by reference, hereinafter deleted, modified, (Articles I, IV and V) (5), [sic] or otherwise rendered inapplicable.

## ARTICLE I

Trustor has delivered to Trustees the sum of ONE HUNDRED DOLLARS ($100.00) as the initial corpus of this Trust.

[The Court notes that there is no ARTICLE II or III.]

## ARTICLE IV

The beneficiaries of this Trust shall be Emily Anne LaFargue, daughter of the Trustor; the issue of Emily Anne LaFargue; and, all blood relatives of Esther Marie LaFargue and Emily Anne LaFargue. Issue shall become beneficiaries immediately upon birth. The term "issue" shall include anyone legally adopted by Emily Anne LaFargue effective immediately upon the judicial confirmation of the parent-child relationship. Persons, other than those specifically referred to above as beneficiaries, may become beneficiaries only upon the exercise of the Special Limited Power of Appointment hereinafter provided.

## ARTICLE V

(2) This is not an accumulation trust.

(5) A Special Limited Power of Appointment is hereby granted to Emily Anne LaFargue as to the total assets of the Trust. * * * The persons and/or organizations which are proper subjects of this Power include:

1. The legal spouse of Emily Anne LaFargue;

2. All blood relatives of all beneficiaries named specifically in this instrument and/or designated as such by the operation of this Power;

3. [Charitable, etc., organizations];

4. [Any other person or organization so long as such recipient would not cause the Power to be defined as a general power of appointment.]

This Power shall take effect only after the death of the survivor of Esther Marie LaFargue and Emily Anne LaFargue. This Power may be exercised by Will or Deed. Should Emily Anne LaFargue not exercise this Special Limited Power of Appointment, then the Trust shall come to an end thirty days after the death of the survivor of Emily Anne LaFargue and Esther Marie LaFargue, and all the assets of the Trust shall, at that time, be distributed equally among all blood relatives selected within the second degree of consanguinity. Emily Anne LaFargue shall have the power to grant additional Special Limited Powers of Appointment to any of the beneficiaries of this Trust upon terms and conditions not inconsistent with this Trust Agreement.

The master trust agreement, to which the specific agreement was referenced, provided that the trust was irrevocable and unamendable and further provided in pertinent part, as follows:

## ARTICLE IV

### DESIGNATION AND DESCRIPTION OF TRUSTOR, TRUSTEE AND BENEFICIARIES

The Trustor, Trustee and Beneficiaries of this Trust shall be set forth in the instrument of which this is a part. The Trustor and Trustee are expressly excluded, both directly and indirectly, from becoming Beneficiaries. Any person who may hereafter be born or legally adopted, who comes within any of the definitions of Beneficiaries hereunder, shall be included as an additional Beneficiary.

The respective interests, whether immediate, contingent or potential of each

of such named or described Beneficiaries hereunder shall be those interests which are set forth in the document of which this is a part.

## ARTICLE V

### Provisions re Accumulation and Distribution

Provisions concerning accumulation and/or distribution of corpus and/or income will necessarily differ from trust to trust. Such questions shall be governed as set forth in the total Trust instrument of which this is a part.

In the absence of specific directions to the contrary, the following general principles shall be applied by the Trustee.

(1) *Taxation of Trustor or Donor.*

Should the Trustor or any subsequent Donor be taxed in any way in any connection with this Trust, the corpus or income which is taxable to such Trustor or Donor shall be returned to such Trustor or Donor, and such gift or income from a gift shall be treated as if the corpus had never been contributed to the Trust in the first instance. It shall be proper for an addition to be made to this Trust which operates in a manner contrary to this provision, but only with the written consent of the Trustee.

(2) *Corpus and Accumulated Income.*

Corpus and all accumulated income shall be finally distributed in any event no later than twenty-one (21) years after the death of the last named Beneficiary.

(3) *Emergencies.*

The mode, manner, terms and conditions intended to govern the distribution of all corpus and income of the entire Trust hereby established will have been set forth for normal circumstances and conditions. Emergencies and conditions of special need, however, constitute special categories not contemplated under such provisions and not intended to be governed thereby and which shall be separately and specially governed as provided below. The additional powers given the Trustee under conditions of emergency are intended to be limited to such special emergency circumstances but, in such special emergency circumstances, shall supersede and prevail over any other provision set forth in this Trust. The Trustee shall have the power and is instructed to depart from the program set forth for normal circumstances and conditions in any emergency for any Beneficiary of the Trust hereby established. Trustor intends here to rely on the judgment of the Trustee.

In any such emergency, the Trustee should do anything and everything to assist the necessitous Beneficiary affected, and should make any distributions of income or corpus, or both, from the Trust hereby established, which Trustee, in its sole judgment, in the premises may deem advisable. Action, even to the full consumption of the entire Trust, in any manner, shall be taken if the emergency requires it. Equality among the Beneficiaries is of little consequence in an emergency.

(4) *Special Needs.*

In the absence of any emergency, any Beneficiary may apply to the Trustee

in writing to request distribution of corpus or income upon the basis that such corpus or income is necessary to the Beneficiary in relation to education, support, maintenance and health, or to enable any such Beneficiary to maintain his or her accustomed standard of living. In cases of need, within these standards, the Trustee may utilize any or all of the Trust assets, and no precept of equality need apply, provided only that the Trustee shall in its sole judgment determine that such distribution of corpus or income is then consistent with the general interests of the Trust and all of the Beneficiaries.

\* \* \* \* \* \* \*

### ARTICLE VII

#### General Provisions re Trustee and Trustee Powers

(A) Specific Trustee-Power Provisions.

\* \* \* \* \* \* \*

(3) *Trustee's Power to Determine Principal and Income.*

The Trustee shall have full power and authority to determine, in its absolute discretion, what shall constitute principal of the Trust estate, gross income therefrom, and net income distributable under the terms of this Trust, except as herein otherwise specifically provided, and the determination of the Trustee with respect to all such matters shall be conclusive upon all persons howsoever interested in this Trust.

\* \* \* \* \* \* \*

(10) *Power to Replace Trustee.*

\* \* \* \* \* \* \*

Neither the Trustor nor any Beneficiary shall ever be given any appointment as a Trustee or co-Trustee hereunder. Any Beneficiary appointed as a Trustee or co-Trustee shall be considered to be dead immediately from the moment of such appointment.

No provision of the total trust agreement, other than those set forth above, more specifically defines the nature of the beneficiaries' interests in the trust. Nor does any term specify whether capital gains and losses should be attributed to the corpus of the trust or to income, other than giving the trustees power to determine principal and income.

In an instrument entitled "Annuity Agreement," executed 2 days later on February 12, 1971, petitioner conveyed to the trust assets having a collective fair market value of $335,000. These assets included petitioner's one-third interest in the non-income-producing parcel of land she received from her father's trust, as well as the proceeds from the liquidation of Bracher Fruit Co., and assorted stocks and municipal bonds. Petitioner's basis in this property was $320,541.

Petitioner received in return a promise by the trustees to pay

her $16,502 annually. At that time, petitioner's life expectancy was 20.3 years, calculated according to the mortality tables of table I, sec. 1.72–9, Income Tax Regs. If she were to live exactly that long, she would recover over her lifetime an amount equal to the fair market value of the assets transferred.

The relevant terms of the annuity agreement are set out below:

1. LaFargue hereby assigns, transfers and sets over to TRUSTEES all of her right, title and interest in and to the assets described in Exhibit "A", attached hereto and incorporated by this reference as if fully set forth herein. LaFargue warrants to TRUSTEES that they will have good title to and are owners of the described property.

2. The sole consideration for the transfer of the above described assets by LaFargue is the annuity for them. There is no independent security for the payment of the annuity. TRUSTEES agree to pay LaFargue the sum of Sixteen Thousand Five Hundred and Two Dollars ($16,502.00) annually commencing on June 1, 1971, and thereafter on the 1st day of June and each succeeding year for the remainder of LaFargue's life. The calculation of this amount is shown in Paragraph 2 of Exhibit "B". All amounts due to LaFargue shall cease to be paid upon her death.

3. The parties to this agreement recognize that there are alternative methods available to accomplish their objectives. These methods have been very seriously considered by the parties and this annuity agreement, providing for the annuity to LaFargue, has been expressly chosen by LaFargue as personally preferable to her. While life expectancy tables and interest tables were consulted, they have not been the sole factors in deciding upon entering into this agreement. LaFargue and TRUSTEES have expressly agreed that no interest factor should be involved in this annuity agreement but do, however, recognize the possibility that the Congress of the United States may, at some time, require an interest factor by statute. The parties, therefore, agree that all payments of annuities made under this agreement shall, for the first ten (10) years, be principal only with the understanding that any interest factor required by law shall then be one half (1/2) of the next ten payments until such interest shall have been brought current with one half (1/2) each such payment from the 11th continuing to be principal. * * *

4. LaFargue expects any annuity payment to be paid promptly, and all such payments made later than ten (10) days after they are due shall carry a penalty assessment of ten percent (10%) of the amount due. Any payment which has not been made within sixty (60) days of the time it shall be due, in addition to the ten percent (10%) penalty payment, shall entitle LaFargue to the payment of any attorney's fees and court costs by TRUSTEES which LaFargue may occur [sic] in bringing an action to compel payments that are due. * * *

5. In executing this annuity agreement and consumating the assignment of the assets referred to hereunder, the parties do not intend that any gift be made by TRUSTEES to LaFargue or to any other person or party and the parties do not intend that any gift be made by LaFargue to TRUSTEES or

any other person or party. The parties have agreed that each of them is respectively receiving full market value under the terms of this agreement.

\* \* \* \* \* \* \*

EXHIBIT "B"

I. Agreed Fair Market Value of Assets
transferred to trustees $335,000.00
II. Annuitant's Life Expectancy 20.3 years
III. Annuity Calculation $\dfrac{\$335,000.00}{20.3 \text{ yrs.}}$ = $16,500.00[3] per year

The subsequent operation of the trust was flavored more by the close family and social friendship among the parties than by the formal legal relationships of grantor/annuitant, trustee, and beneficiary. Petitioner attended meetings regarding the administration of the trust. Strict attention was not paid to the procedures required by the trust and annuity agreements. For example, petitioner received her payment for 1971 not on June 1, but on September 1. No penalty assessment for the late payment was made although the annuity agreement provided for a penalty. Similarly, the 1972 payment was not made until December 29, but no penalty was included. In 1973, the trust paid petitioner $16,502 on July 6, more than a month late.

Administration was lax in the other areas. Although petitioner gave the trustees the stock certificates when the annuity agreement was executed, no notice of the transfer was given to the transfer agent of the issuers of stock until much later. As a result, petitioner continued to receive dividends, which she deposited in her personal account, of approximately $2,200 per year in 1971, 1972, and 1973. However, she did not report these dividends as income for the 3 years. The dividends for 1971 and 1972 were reported on the fiduciary income tax returns of the trust for those years, which were filed June 1973. The 1973 dividends were reported on the fiduciary income tax return for that year, which was filed in April 1974. Most of the stock transferred to the trust was not transferred on the records of the issuers until November 1973.

Confusion existed in the minds of the parties as to trust payments to Emily La Fargue.[4] Although the trust instrument

---

[3]In fact, the correct quotient is $16,502 and that is the payment specified in the body of the annuity agreement.

[4]According to the trust agreement, the beneficiaries of the trust were Emily, her issue, and all blood relatives of Emily and petitioner. However, Emily had no issue and no distributions were ever made to, or considered for, anyone other than Emily.

specifically provided that it was not an accumulation trust, both petitioner and her daughter understood that Emily was entitled only to the money she needed. Inquiries were made from time to time by Mr. Margolis' office as to whether Emily needed money. Although it is difficult to determine from the record the exact amounts actually distributed to the beneficiary, it appears that she received nothing from the trust in 1971 and 1972 and $6,500 in 1973.

Distributions in these amounts were not reflected on any of the tax returns filed for the years in question. On the trust's various fiduciary returns for 1971 and 1972 (the first versions of which were not executed until June 11, 1973), the trust deducted amounts for "distributions to beneficiaries" which resulted in no taxable income to the trust. The amounts of these deductions, as shown on the returns, are as follows:

| Return | Date executed | Deduction for distribution to beneficiary |
|---|---|---|
| 1971 original ................ | 6/11/73 | $1,186.54 |
| 1971 amended .............. | 4/4/74 | 12,950.01 |
| 1972 original ............... | 6/11/73 | 17,176.17 |
| 1972 amended .............. | 4/4/74 | 17,427.23 |
| 1972 second amended .... | 1/26/77 | 10,402.00 |

Emily did not file 1971 and 1972 returns including any of these amounts in her income until April 1974. Emily's returns were prepared by Mr. Margolis' office, which withdrew money from the trust to pay her taxes and deposited any tax refunds in the trust's bank account.

The trust had the following items of income and loss or deduction for these years:

| 1971 | | |
|---|---|---|
| Income | Loss | |
| Ordinary dividends ............. $2,231.29 | Long-term capital loss ...... $11,828.61 | |
| Interest ........................... 11,459.51 | | |

| 1972 | | |
|---|---|---|
| Income | Deductions | |
| Ordinary dividends ............. $2,256.60 | Taxes ........................... $1,435.55 | |
| Interest ........................... 16,744.51 | Miscellaneous (trust and property-maintenance | |
| Capital gain dividends ........ 82.35 | expenses, etc.) ............,..... 138.33 | |

*1973*

| Income | | Loss and Deductions | |
|---|---|---|---|
| Ordinary dividends | $2,113.86 | Partnership loss | $10,000.00 |
| Interest | 7,832.45 | Taxes | 1,344.97 |
| Rent | 120.00 | Miscellaneous (trust and property-maintenance | |
| Capital gain dividends | 50.63 | expenses, etc.) | 173.16 |

## OPINION

The question presented is how the set of events described above should be characterized for income tax purposes. Petitioner would have us view them as two separate events: (1) The creation of a trust and (2) the sale to, or exchange with, the trust for an annuity of property worth $335,000. She contends that no portion of the payments in question is taxable under section 72,[5] the provision dealing with taxation of annuities, which provides for taxation of only that portion of each payment which exceeds the product of the "exclusion ratio" (investment in contract divided by expected return) and the amount of the payment. Because the annuity agreement specifically states that the annuity contains no interest factor, and because the annual payments were computed by simply dividing the total consideration by petitioner's life expectancy, petitioner argues that her

---

[5] SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(a) GENERAL RULE FOR ANNUITIES.—Except as otherwise provided in this chapter, gross income includes any amount received as an annuity (whether for a period certain or during one or more lives) under an annuity, endowment, or life insurance contract.

(b) EXCLUSION RATIO.—Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date). This subsection shall not apply to any amount to which subsection (d)(1) (relating to certain employee annuities) applies.

(c) DEFINITIONS.—

(1) INVESTMENT IN THE CONTRACT.—For purposes of subsection (b), the investment in the contract as of the annuity starting date is—

(A) the aggregate amount of premiums or other consideration paid for the contract * * *

* * * * * * *

(3) EXPECTED RETURN.—For purposes of subsection (b), the expected return under the contract shall be determined as follows:

(A) LIFE EXPECTANCY.—If the expected return under the contract, for the period on and after the annuity starting date, depends in whole or in part on the life expectancy of one or more individuals, the expected return shall be computed with reference to actuarial tables prescribed by the Secretary or his delegate.

(B) INSTALLMENT PAYMENTS.—If subparagraph (A) does not apply, the expected return is the aggregate of the amounts receivable under the contract as an annuity.

expected return exactly equals her investment in the contract, and that a 100-percent exclusion ratio results.

Petitioner also contends that she realizes no taxable gain on her exchange of appreciated property for an annuity until she recovers her basis in the property. She relies on *Lloyd v. Commissioner*, 33 B.T.A. 903 (1936), which held that, where property is transferred in exchange for an individual's promise to make annuity payments in the future, no taxable gain is recognized by the transferor until he recovers his basis because the transferee's promise has no fair market value due to the uncertainty as to whether the individual will actually be able to make the payments when they are due. Compare *212 Corp. v. Commissioner*, 70 T.C. 788 (1978), and *Estate of Bell v. Commissioner*, 60 T.C. 469 (1973), holding that gain is recognized in year of transfer where the annuity contract is secured.

Respondent, on the other hand, characterizes the transaction as, in essence, a transfer in trust as to which petitioner should be treated as the owner under section 677(a),[6] with the result that its income would be taxable to her under section 671.[7]

In the alternative, if the transaction is treated as an annuity for tax purposes, respondent contends that the application of section 72 to the facts herein is governed by *Estate of Bell v. Commissioner, supra*. He asserts that petitioner's "investment in the contract" is the present value of the right to receive $16,502 for 20.3 years, as computed from the actuarial tables (based on a 6-percent interest rate) set forth in section 20.2031–10(f), Estate Tax Regs. Dividing this present value figure ($176,990) by the expected return ($16,502 x 20.3 or $334,990),

---

[6]SEC. 677. INCOME FOR BENEFIT OF GRANTOR.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—

    (1) distributed to the grantor or the grantor's spouse;

    (2) held or accumulated for future distribution to the grantor or the grantor's spouse * * *

[7]SEC. 671. TRUST INCOME, DEDUCTIONS, AND CREDITS ATTRIBUTABLE TO GRANTORS AND OTHERS AS SUBSTANTIAL OWNERS.

Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. Any remaining portion of the trust shall be subject to subparts A through D. No items of a trust shall be included in computing the taxable income and credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust under section 61 (relating to definition of gross income) or any other provision of this title, except as specified in this subpart.

respondent calculates the exclusion ratio to be 52.8 percent. Respondent characterizes the difference between the market value of the property transferred to the trust and the present value of the right to receive the annual payments as a gift to the trust, not properly includable in the computation of the "investment in the contract"[8] under *Estate of Bell v. Commissioner, supra.* In the event that the Court should disagree with this contention and find that the "investment in the contract" was the full fair market value of the property transferred, respondent argues that petitioner realized a capital gain represented by the difference between her cost basis in the transferred assets and such full fair market value, reportable ratably over her life expectancy.[9]

The pivotal question is whether the transaction at issue is to be treated as an annuity or a trust. Petitioner argues that she is entitled to arrange her affairs in whatever manner she chooses, that she chose an annuity and not a trust, and that the tax consequnces are governed by that form. It is well accepted that a taxpayer has "The legal right * * * to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits." See *Gregory v. Helvering,* 293

---

[8]We note that, although respondent characterizes the transfer as a gift in part, he has not asserted a gift tax deficiency.

[9]In his notice of deficiency for the years 1971 and 1972, respondent stated that "the transaction giving rise to the purported private annuity should not be recognized as bona fide for federal tax purposes" and included in her income the payments of $16,502 received in each of the years. In his notice of deficiency for 1973, respondent stated that the "sum of $16,502.00 received by [petitioner] * * * is taxable as ordinary income in the amount of $16,502.00." Petitioner contends that, because of the general language of the deficiency notices, the burden of proof on all issues should be shifted to respondent. Although petitioner does not so state, we assume that the thrust of her argument is that the specificity in respondent's arguments (as contrasted with the general language of the deficiency notices) requires such arguments to be characterized as "new matter." See Rule 142(a), Tax Court Rules of Practice and Procedure. However, a clarification or development of respondent's original determination that does not raise new factual issues or increase the amount of the deficiency does not constitute new matter. See *Estate of Jayne v. Commissioner,* 61 T.C. 744, 748–749 (1974); *McSpadden v. Commissioner,* 50 T.C. 478, 493 (1968). We think respondent's arguments fall within the scope of this Rule. Nor are we aware of any other basis for shifting the burden of proof to respondent except possibly in the context of the constitutional issue raised by petitioner which we have rejected. See n. 2 *supra.*

There is, in any event, little dispute as to the facts that bear on the characterization of the transaction herein. With respect to the amount of the trust's income, respondent stated in his Exceptions to the Special Trial Judge's Report that, for the purpose of a Rule 155 computation herein, he would accept the Special Trial Judge's findings of fact with respect to the income, deductions, and losses of the trust, although he has done so solely in respect of the computation of petitioner's taxable income for the taxable years before us (1971, 1972, and 1973). Petitioner has not objected to the Special Trial Judge's findings of fact in these respects and presumably has no objection since they were based on the trust's fiduciary tax returns. Thus, the question of where the burden of proof lies has no practical impact.

U.S. 465, 469 (1935). It is also well established that the substance of a transaction rather than its form determines the tax consequences of a transaction unless the statute indicates that form is to govern. See, e.g., *Lazarus v. Commissioner*, 58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975). "This principle is peculiarly applicable to annuities and trusts because they are easily susceptible of manipulation so as to create illusion." See *Lazarus v. Commissioner, supra* at 864, and cases cited thereat. Indeed, we have frequently viewed a series of related transactions as a whole and found that what was in form a transfer of property to a trust in exchange for an annuity was in substance a trust of which the "annuitant" was a grantor-owner or beneficiary. See *Lazarus v. Commissioner, supra; Bixby v. Commissioner*, 58 T.C. 757, 789–791 (1972); *Smith v. Commissioner*, 56 T.C. 263 (1971); *Wright v. Commissioner*, 38 B.T.A. 746 (1938). See also *Legg v. Commissioner*, 57 T.C. 164, 170–171 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974). Moreover, even if a taxpayer appears to be entitled to the benefit of a particular statutory provision, he may nevertheless find himself caught, because of the nature of the transaction, in the net of another statutory provision. See *Lazarus v. Commissioner, supra* at 864.

We conclude, for the reasons hereinafter stated, that the substance of the transaction in question was the creation of a trust providing, among other things, for an annual payment of $16,502 to the grantor. In reaching this conclusion, no one factor has been decisive. Rather, our decision is based on the totality of the considerations discussed below. See *Lazarus v. Commissioner, supra* at 867. Cf. *Furman v. Commissioner*, 45 T.C. 360, 364 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967).

We see no need to repeat the litany of the specific criteria which have been utilized in analyzing transactions such as those involved herein—criteria this Court and the Ninth Circuit Court of Appeals (to which an appeal herein would lie) set forth in detail and applied in *Lazarus v. Commissioner, supra*. Rather, we will concentrate our analysis herein on those specific elements of similarity and difference between the instant case and *Lazarus* which are warranted by the circumstances.

In the first place, there was no reason for petitioner to bifurcate the transaction into the creation of a trust and the purchase of an annuity. The trust and annuity were part of a

prearranged plan. Petitioner could have achieved the same result more directly by transferring her property to the trust and reserving the right to receive an annual payment of $16,502. See *Estate of Schwartz v. Commissioner*, 9 T.C. 229, 238–241 (1947). In fact, the transfer to the trust, which petitioner characterizes as a purchase of an annuity, was the very foundation of the trust. Without that property, the trust would have been an empty shell. See *Samuel v. Commissioner*, 306 F.2d 682, 688 (1st Cir. 1962), affg. *Archbishop Samuel Trust v. Commissioner*, 36 T.C. 641 (1961); *Lazarus v. Commissioner*, 58 T.C. at 868.

Second, in point of fact, petitioner could look only to the transferred property itself, including some of the income therefrom (see p. 59 *infra* ), as the source of the annual payments to her. We recognize that in a variety of situations involving transfers, there is no personal obligation (e.g., property sold "subject to" a purchase-money mortgage) or the personal obligation may be of little value except to the extent that an otherwise impecunious transferee-promisor uses the property or its proceeds to make the required payments. We also recognize that the identification of source of payment herein is not as direct as it was in *Lazarus v. Commissioner, supra,* where the payment involved was coextensive with the anticipated income from the transferred property. Thus, while the element of the transferred property as the source of payment may well be less significant in the instant situation, it should be accorded considerable weight in evaluating the totality of the circumstances. Indeed, this element was considered significant by the Ninth Circuit Court of Appeals in *Lazarus v. Commissioner, supra,* in distinguishing *Fidelity-Phila. Trust Co. v. Smith*, 356 U.S. 274, 280 n. 8 (1958), heavily relied upon by petitioner. In fact, the Court of Appeals concluded that the language of the Supreme Court militated against the taxpayer's position because in *Lazarus,* as is the case herein, the transferred property was chargeable with the payments to be made, while in the case of an annuity, the annuitant has no continuing interest in the property. See 513 F.2d at 830. See also *Samuel v. Commissioner, supra* at 687.

Third, the lack of relationship between the present value of the purported sale price (i.e., the present value of the payments to which petitioner was entitled, i.e., $176,990) and the fair

market value of the property transferred ($335,000) is uncharacteristic of an arm's-length sale or exchange. The absence of a downpayment and lack of security would clearly point to a differential in the other direction, i.e., a premium.[10] See *Lazarus v. Commissioner, supra* at 868. Moreover, the unreality of the claim of a bona fide sale is also reflected by the express negation of a gift and the failure of petitioner to consider how much a comparable annuity from a commercial institution would have cost.

Fourth, the absence of an interest factor in the calculation of the deferred payments is another indication of absence of an arm's-length transaction. See *Lazarus v. Commissioner, supra* at 869. Petitioner claims that there is no provision of law requiring that an annuity contain an interest factor and that we should hold that the absence of such a factor as a matter of law has no bearing on whether a transaction constitutes an annuity. Respondent, on the other hand, places great emphasis on the absence of an interest factor as the critical element of decision. Both parties have favored us with exhaustive analyses of the legislative and judicial history of annuities since the inception of the income tax law. Petitioner's importuning to the contrary, notwithstanding, we find it unnecessary to resolve the question whether, under any and all circumstances, the absence of an interest element is irrelevant to the existence of an annuity.

There is no doubt that Congress, in enacting section 72 (and its predecessors starting with section 22(b)(2) of the Revenue Act of 1934, Pub. L. 216, 73d Cong., 2d Sess.) dealing with annuities, had contractual arrangements involving an interest element in mind. See, e.g., H. Rept. 704, 73d Cong., 2d Sess. 21 (1934), 1939–1 C.B. (Part 2) 554; S. Rept. 558, 73d Cong., 2d Sess. 23 (1934), 1939–1 C.B. (Part 2) 586. Admittedly, an interest factor is usually present where an annuity is involved. See *Hill's Estate v. Maloney,* 58 F. Supp. 164 (D. N.J. 1944); *Lazarus v. Commissioner, supra* at 869. Moreover, in a recent case, where the difference between the expected return ($224,400) and the fair market value of the property transferred ($207,600) clearly was less than the comparable figure arrived at by the use of an appropriate

---

[10]In this connection, we are not unaware of the fact that where property is sold or exchanged for an annuity, there is usually no downpayment and often no security. But, the issue we are dealing with is not whether there is an annuity rather than a sale or exchange, but rather, whether there is a reserved interest in a trust rather than a sale or exchange. See n. 12 *infra.*

interest factor, we did not hesitate to utilize the discounted value of the annuity in determining the tax consequences, i.e., the Court in effect imputed interest. See *Estate of Bell v. Commissioner, supra.* See also *Estate of Bartman v. Commissioner,* 10 T.C. 1073, 1078 (1948); *Estate of Bergan v. Commissioner,* 1 T.C. 543, 554 (1943).

On the other hand, as petitioner points out, we have declined to find a taxable interest element in other situations not involving annuities. See *Crown v. Commissioner,* 67 T.C. 1060 (1977), affd. 585 F.2d 234 (7th Cir. 1978) (whether interest-free loan gives rise to a taxable gift); *Dean v. Commissioner,* 35 T.C. 1083 (1961) (whether interest-free loans to controlling shareholder give rise to taxable income), recently reaffirmed in *Zager v. Commissioner,* 72 T.C. 1009 (1979), and *Greenspun v. Commissioner,* 72 T.C. 931 (1979).[11] But, we think that we would be painting with too broad a brush stroke if we were to draw from the foregoing analysis, covering many diverse tax issues, the rule of law which petitioner seeks to elicit from us. We think that, in the context of this case, we need and should go no further than we did in *Lazarus v. Commissioner, supra,* i.e., to hold that the absence of an interest element is simply one factor to be taken into account in determining whether there is a sale or exchange of property or a transfer in trust with a reserved interest.[12]

Fifth, the manner in which the transferred property and "annuity" were administered suggests that petitioner viewed herself more as the beneficial owner of the property than as the creditor of the trustees. See *Samuel v. Commissioner,* 306 F.2d at 688. For 3 years, petitioner continued to receive directly dividends from stocks that were supposed to have been sold to the trust. Further, annuity payments to petitioner were not timely but she did not assert her right to a penalty payment. Additionally, petitioner was included in meetings to discuss the

---

[11]Compare *Blackburn v. Commissioner,* 20 T.C. 204 (1953), and *Berkman v. Commissioner,* T.C. Memo. 1979–46, in which we imputed interest for gift tax purposes, where term (as distinguished from demand) notes were involved.

[12]Conceptually speaking, it is only in this context that the no-interest factor has relevance. Whether or not a sale or exchange occurs should not turn on the fact that property is transferred for annual lifetime payments instead of a series of payments over a period of time—witness the fact that a transfer of property in return for annual lifetime payments can produce taxability of both portions of the payments as an annuity and a gain from the sale or exchange. Compare *212 Corp. v. Commissioner,* 70 T.C. 788 (1978), and *Estate of Bell v. Commissioner,* 60 T.C. 469 (1973), and cases discussed therein.

administration of the trust and her testimony indicated that, although she did not take an active role and was not particularly well informed about the trust investments, she expected to be kept informed. That petitioner viewed herself as the beneficial owner of the property is further evidenced by her testimony that she wanted an arrangement that would provide for the management of her property. And Emily confirmed this view on petitioner's part through her testimony that the purpose of the trust was to preserve the assets and provide primarily for her mother and only secondarily for her. We make the foregoing observations about attitudes and methods of administration, solely in the context of the sale or exchange versus trust issue and not in the context of whether such participation in and of itself created sufficient ties to the property to satisfy the tests of taxability of the income of a trust to the petitioner as grantor of the trust under sections 671 through 677. Cf. *United States v. Byrum*, 408 U.S. 125 (1972); *Estate of Gilman v. Commissioner*, 65 T.C. 296 (1975), affd. per curiam 547 F.2d 32 (2d Cir. 1976).

Sixth, as we have already noted (see p. 54 *supra*), the precise tie-in between the income of the trust and the annual payment to the taxpayer, which existed in *Lazarus v. Commissioner*, *supra*, is lacking herein. Indeed, this is a distinction upon which petitioner places great reliance. Nothing in *Lazarus*, however, persuades us that it represents the outer limits for determining that a purported transfer of property for an annuity in reality constitutes a transfer in trust. *Becklenberg's Estate v. Commissioner*, 273 F.2d 297 (7th Cir. 1959), revg. 31 T.C. 402 (1958), also relied upon by petitioner, is clearly distinguishable. In that case, payments were being made by the trust to one of the grantors as an interim measure until the trust could be liquidated and an annuity purchased. Moreover, there were three grantors and the decedent's rights were not limited to the property transferred by her. See also *Lazarus v. Commissioner*, 58 T.C. at 872–873.

In view of the foregoing, we hold that the transactions involved herein did not constitute a transfer of property in exchange for annuity payments to petitioner, but rather resulted in the creation of a trust of which petitioner should be treated as the owner to the extent of her interest therein. In so holding, we are not concluding that there may never be an arrangement between a transferor and a trust established by him which would qualify as a bona fide transfer of property for

an annuity. Resolution of this issue will inevitably depend, as it has herein, upon an analysis of the totality of the circumstances of the particular situation, including such elements as the availability of other trust assets as a source of payment of the so-called annuity (cf. *Becklenberg's Estate v. Commissioner*, *supra*), and upon the degree of clarity of the underlying documentation and of the care with which the arrangements were implemented. We note, however, that we have serious doubts whether section 72 rather than the grantor trust provisions of sections 671 through 677 would apply to any situation where the assets transferred to the trust are *the* engine designed to fuel the so-called annuity payments.

We now turn to the question of the extent to which petitioner is taxable on the income of the trust under the so-called grantor trust provisions of the Code. Section 677(a) provides that the grantor of a trust "shall be treated as the owner of any portion of a trust * * * whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be * * * distributed to the grantor."[13]

Although it is not entirely clear, respondent appears to be contending that the measure of petitioner's taxability under section 677(a) is the entire income of the trust. Thus, in his Exceptions to the Special Trial Judge's Findings of Fact and Conclusions of Law, respondent concedes that the petitioner would not be taxable on the $16,502 annual payments if the trust income were less than that amount, but it is unclear whether he accepts the position that $16,502 is the limiting amount in respect of any year in which the trust income exceeds that amount, a situation which seems to obtain in respect of the 1972 taxable year of the trust.

Respondent's position seems to be that (1) if the property transferred by petitioner to the trust had been converted by petitioner into cash, it would have produced $335,000 (its stipulated fair market value); (2) if that amount were put in a savings account, paying 5-percent interest, it would at a

---

[13]It is clear that none of the trustees is an adverse party, a term which is defined in sec. 672(a) as "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." Although Maxine Louise Gardner is a blood relative of petitioner and, thus, within the class of beneficiaries, the trust agreement further provides that any beneficiary who is appointed as a trustee shall "be considered to be dead immediately from the moment of such appointment."

minimum have produced the amount of the annual payment of $16,502; (3) passbook savings accounts are notoriously conservative investments; (4) ergo, it could be anticipated that the trust would produce income in excess of the amount of the annual $16,502 payment and, consequently, petitioner should be considered as the owner of the entire trust income. Our analysis of the instant situation, however, leads us to conclude that, if respondent's position extends as far as we have outlined, it should be rejected.

There can be no question but that it was contemplated that the initial principal would provide for the annual payment of $16,502 to petitioner, since this payment times her life expectancy was exactly equal to the fair market value of the property at the time of transfer. Thus, it seems that, at most, only future increases in the value of the trust principal and the income could have been considered available for distributions to other persons. But, the trust instrument made no specific provisions for distributions to the "beneficiaries" who were designated as Emily, petitioner's daughter, Emily's issue (of which there were none), and all blood relatives of petitioner and Emily. It simply stated that the trust "is not an accumulation trust." See p. 44 *supra*. We do not view this latter provision as requiring that the current income could not be used as a source for the annual payments to petitioner. We reach this conclusion because of the absence of any direction for distribution of income currently except to meet Emily's needs and in emergencies or other special situations, all of which were to be accomplished in the trustees' discretion. Under such circumstances, we do not think that the use of current income as a source of the annual payments to petitioner would be considered an "accumulation." On the other hand, we view the provision regarding accumulation as prohibiting the addition to corpus of any ordinary income (as distinguished from income properly allocable to corpus) which was not used to make the annual payment and that, to this extent, such income was required to be distributed and could not be held for payments to petitioner in subsequent years. In short, to the extent outlined, we think that, in each year, the payments to petitioner were to come ahead of all others irrespective of the labels which might be accorded to recipients of funds from the trust. *Lazarus v. Commissioner*, 58 T.C. at 869–870; cf. *Estate of Pardee*, 49 T.C. 140, 148 (1967).

Based upon the foregoing, we hold that the current income of the trust, both ordinary income and income allocable to corpus, in an amount not to exceed $16,502 per year, "may be distributed" to petitioner within the meaning of section 677(a). In accordance with the regulations, a portion of each item of trust income,[14] deduction, and credit (or each item in its entirety, if the trust income is less than $16,502) is includable in petitioner's income. Sec. 1.671–3(a)(3), Income Tax Regs. The portion of each item which is attributable to petitioner is treated as if it had been received or paid directly by her.[15] Sec. 1.671–2(c), Income Tax Regs. Where, in any year (such as 1972) the ordinary income and income allocable to corpus exceeds $16,502, the proportionate share of each item of income, deduction, and credit will be determined by applying the fractional share of such item in which the numerator is $16,502 and the denominator is the aggregate amount of ordinary income and income allocable to corpus. Cf. *Barber v. United States*, an unreported case (N.D. Ala. 1956, 52 AFTR 1222, 57–1 USTC par. 9377), affd. 251 F.2d 436 (5th Cir. 1958). Compare *Edgar v. Commissioner*, 56 T.C. 717, 759 (1971), where the taxpayers were denied the benefit of certain partnership losses allocable to corpus, because they were found to be the grantor-owners only to the extent of the current ordinary income of the trust.

In view of our holding that section 677(a) is applicable, we have no need to delve into a further issue (raised by the Special Trial Judge and given sparse treatment by the parties on brief) as to the possible applicability of section 673 because the right of petitioner to the annual payments should be treated as a reversionary interest.[16] The issue raises difficult questions as to

---

[14]As used in the regulations, "income" refers to income for tax purposes and not to income for trust accounting purposes. Thus, it includes both ordinary income and income allocable to corpus. Sec. 1.671–2(b), Income Tax Regs.

[15]We have made no findings with respect to certain losses and credits which are carried back from subsequent years on some of the trust returns for the years in issue. Such findings are not necessary because petitioner is entitled to no share of these carried back items except during the years in which they originate. In any year in which the trust income exceeds $16,502, petitioner's allocable share of each item of deduction or credit will be less than the full amount thereof. The balance of each such item of deduction or credit will be allocable to the trust in the same proportion that the excess income is allocable to it. Any rights to carrybacks or carryforwards stemming from deductions or credits thus allocable to the trust will belong to it and not to petitioner. Whether petitioner might carry back or carry forward the losses or credits allocable to her (including, as stated in the text, the entire losses or credits when the income is $16,502 or less) will be controlled by her own individual tax situation.

[16]The possibility of a reversionary interest also exists by virtue of article V(1) of the master trust agreement (see p. 45 *supra* ), which provides that if the grantor is held to be taxable in any way, the income or corpus which is so taxable shall revert to her. See *Thompson v. United States*, 209 F. Supp.

the definition of a "reversionary interest" for purposes of section 673 and the need to evaluate potential fluctuation in the principal of the trust in order to determine whether the entire principal of the trust or only a portion thereof could "reasonably be expected" to come back to petitioner within 10 years. Cf. *Crane v. Commissioner*, 368 F.2d 800 (1st Cir. 1966), affg. 45 T.C. 397 (1966).

*Decisions will be entered under Rule 155.*

---

530, 541 (E.D. Tex. 1962), revd. and remanded on another issue 332 F.2d 657 (5th Cir. 1964). Compare *Commissioner v. Procter,* 142 F.2d 824 (4th Cir. 1944), revg. and remanding a Memorandum Opinion of this Court, with *King v. United States,* 545 F.2d 700 (10th Cir. 1976).