ESTATE OF MOLLIE P. FABRIC, ELLIOT FABRIC, PERSONAL REPRESENTATIVE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17536–81.    Filed December 11, 1984.

*David M. Berman, Malcolm H. Neuwahl,* and *David A. Freedman,* for the petitioners.
*Lourdes M. DeSantis,* for the respondent.

STERRETT, *Judge*: By notice of deficiency dated April 13, 1981, respondent determined a deficiency of $457,902 in the Federal estate tax of the Estate of Mollie P. Fabric. After concessions, the issues before us are: (1) Whether the decedent entered into a valid annuity or retained a life estate in the transferred properties, and (2) if a valid annuity existed, whether adequate and full consideration was given.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Mollie P. Fabric (hereinafter referred to as decedent) was born on May 1, 1909, and died, testate, on February 21, 1977, a resident of Florida. She was survived by her four sons, Elliot, Robert, Bruce, and Stuart.[1] Decedent's son Elliot is the personal representative of her estate, and he resided in San Francisco, CA, at the time the petition in this case was filed.[2] Decedent's Federal estate tax return was timely filed with the Office of the Internal Revenue Service, Jacksonville, FL.

Decedent's family had a history of myocardial infarctions (heart attacks) and hypertension (elevated blood pressure). The decedent had had hypertension since at least 1962. On May 31, 1974, the decedent was hospitalized, suffering from

---

[1] Decedent's husband, Ben Lue Fabric, had passed away in 1965.

[2] We note that decedent's estate was located in Florida and that the executor resided in California. Petitioner and respondent apparently agree that appeal in this case lies in the Ninth Circuit. We will proceed on this assumption.

multiple medical problems, including kidney problems, ulcerative colitis, and hypertension. Decedent was treated and released on July 3, 1974.

During the first 9 months of 1975, the decedent had severe chest pains, which were alleviated only with nitroglycerine. On September 5, 1975, the decedent's chest pains had increased in their intensity, resulting in an unexpected hospitalization. Medical tests conducted on the decedent revealed that she had a blockage in a single coronary artery. The obstruction, or occlusion, was determined to be in the range of 95 to 99 percent. To alleviate this blockage, the decedent underwent coronary artery bypass surgery (open-heart surgery) on September 24, 1975. Prior to the surgery, the decedent's physicians predicted that she had a 60- to 75-percent chance of survival. Decedent survived the surgery, but it was not the end of her medical treatment.

On October 8, 1975, decedent had a permanent intravenous pacemaker inserted. The pacemaker was inserted in order to regulate the decedent's heartbeat, which had slowed somewhat after her surgery. Decedent was discharged from the hospital on October 11, 1975.

During October, November, and early December 1975, the decedent had pleural effusion, which is retention of excessive fluid in the chest and lungs. Pleural effusion is very common after open-heart surgery and is not a serious problem. The decedent entered the hospital in December 1975 to have this condition treated.

After the decedent was discharged, her followup care was entrusted to Dr. Morton Diamond, a cardiologist practicing in Hollywood, FL. Dr. Diamond first met and began treating the decedent in January 1976. At that time the decedent had hypertension, arteriosclerotic heart disease, hypertensive heart disease, chronic renal disease, and ulcerative colitis. Even with decedent's medical problems, Dr. Diamond was of the opinion that as of the latter part of 1975 and as of January 1976 he would have expected the decedent to live easily several years, possibly even in excess of 5 years.[3]

Decedent was hospitalized on January 6, 1977, because of congestive heart failure. The decedent was hospitalized for the

---

[3]Dr. Diamond's testimony, which we find to be credible, was based on his review of the decedent's prior medical records.

last time on February 11, 1977, and died on February 21, 1977, from congestive heart failure. Decedent's death occurred approximately 1 year and 5 months after her September 24, 1975, operation.

On September 19, 1975, five days prior to her September 24, 1975, operation, the decedent executed numerous documents. These documents included her last will and testament, the creation of a foreign trust (hereinafter referred to as the Chai Trust), and a proposal to enter into an annuity agreement with the trustee of the Chai Trust. The proposal was accepted by the trustee on September 22, 1975.

The Chai Trust was initially funded with $750. It was irrevocable and the decedent did not retain any control over it. Decedent did send the independent trustee, Cayman National Bank, a letter expressing her desire that the trustee consult with her son and her attorney with respect to trust investment decisions.[4] This letter, however, was merely precatory and we attach no legal significance to it. The beneficiaries of the Chai Trust were the decedent's four sons and their lineal descendants. Pursuant to the terms of the trust instrument, the beneficiaries were to receive distributions from the trust on its fourth, sixth, and eighth anniversaries. The distributions on their respective dates, however, were contingent on the decedent's not receiving payments pursuant to the annuity agreement (i.e., so long as the decedent were living, no distributions from the trust could be made to the beneficiaries).

In accordance with the annuity agreement, Cayman National Bank agreed to pay decedent the sum of $2,378.48 per week for the rest of her life.[5] The annuity was a fixed obligation and was not dependent on the trust's income. Its amount was determined by use of the tables set forth in section 20.2031–10, Estate Tax Regs. In consideration for the bank's promise, decedent agreed to transfer assets to the trust totaling $1,150,000 in value. Under the laws of the Cayman Islands, the bank was liable to the full extent of its assets for paying the

---

[4]While Elliot Fabric did offer investment suggestions to the trustee, his advice was never followed.

[5]These payments were deposited into a bank account jointly held by the decedent and Elliot Fabric. Since this asset was included in the decedent's gross estate, no estate tax issues attach to this fact.

annuity in the event the Chai Trust assets had been exhausted.[6]

Mr. Steinberg, a qualified expert actuary, testified that the purchase of a private annuity in 1975 under the same terms and conditions as the decedent's would have cost approximately $1,215,000. He was of the opinion that decedent had received adequate and full consideration for her transfer of assets in exchange for the annuity.

There were some administrative problems in carrying out the terms of the annuity agreement. Cayman National Bank did not make all of the required annuity payments to the decedent. Further, many of the payments were not distributed in a timely manner. These missing and late payments gave decedent rights as a creditor against Cayman National Bank under the annuity agreement. In addition, there were some delays in transferring decedent's assets to the Chai Trust. These delays resulted in the decedent's receiving some interest on investments which legally belonged to the trust. It should be noted that, except for the missing annuity payments, these minuscule problems were resolved. On balance, the parties to the trust and annuity agreement recognized and respected the terms and conditions of these documents.

Decedent's estate tax return did not report the transfer of assets to the Chai Trust, made under the annuity agreement, as a taxable transfer. In his statutory notice of deficiency, respondent determined that the value of those assets transferred is includable in the decedent's gross estate because they were either gratuitously transferred by the decedent within 3 years of her death and in contemplation of death, or, in the alternative, the assets were gratuitously transferred by the decedent with the retention of the right to the income from the property for the remainder of decedent's life.

OPINION

We are faced with the question of how the above-described events should be characterized for estate tax purposes. Petitioner argues that the creation of the Chai Trust and the sale to, or exchange with, the trust for an annuity were two

---

[6]It should be mentioned that, subsequent to the bank's acceptance of the annuity agreement, decedent's son Elliot allegedly personally guaranteed the annuity. We give no legal significance to this, however, since at that time Elliot did not have the wherewithal to satisfy his alleged guarantee.

separate events. It is petitioner's contention that decedent entered into a valid and binding annuity agreement with the trust, for which adequate and full consideration was given. In support of the argument that adequate consideration was given, petitioner notes that the amounts of the annuity payments were determined from the actuarial tables set forth in section 20.2031–10, Estate Tax Regs. Thus, petitioner maintains that none of the assets that decedent transferred to the trust under the terms of the annuity agreement should be included in her estate.

Respondent maintains that the decedent did not purchase an annuity but instead retained a life estate in the transferred properties. Thus, under section 2036,[7] respondent argues that the value of the transferred properties should be included in decedent's estate. Alternatively, respondent argues that if a valid annuity agreement existed, then adequate and full consideration was not given. This is premised upon the contention that decedent was not entitled to use the actuarial tables set forth in section 20.2031–10, Estate Tax Regs., in valuing the annuity. Respondent maintains that use of the tables was inappropriate because, at the time of the transfer, decedent's death was clearly imminent and her medical condition was incurable.

The critical issue is whether the disputed transaction is to be treated as an annuity, or a retained life estate in the transferred properties. This issue has been addressed in the income tax context by this Court in *Lazarus v. Commissioner*, 58 T.C. 854 (1972), affd. 513 F.2d 824 (9th Cir. 1975); in *La Fargue v. Commissioner*, 73 T.C. 40 (1979), affd. in part and revd. in part 689 F.2d 845 (9th Cir. 1982); and in *Stern v. Commissioner*, 77 T.C. 614 (1981), revd. and remanded 747 F.2d 555 (9th Cir., Nov. 15, 1984). Since the annuity issue is separate and distinct from what income or estate tax consequences should attach to its resolution, the rationale of these cases is fully applicable to the case at bar.

In *Lazarus*, pursuant to a comprehensive plan, taxpayers established a foreign trust for the benefit of their family members. Taxpayers then entered into an annuity agreement with the trust whereby they transferred stock to the trust in

---

[7]Unless otherwise stated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the year here in issue.

exchange for the trust's promise to pay them $75,000 a year for life. As part of the prearranged plan, the trust sold the stock to a corporation for a nonnegotiable promissory note, which provided for annual interest payments of $75,000. We found that an annuity had not been purchased. Rather, the transaction was a transfer of the stock to the trust with a reservation of the right to have the annual income of $75,000 distributed to taxpayers.

In finding that a valid annuity was not created, the following factors were deemed important:

(1) The alleged annuity payments exactly equaled the income generated by the trust. No distributions could have been made from the trust corpus because its sole asset was a nonnegotiable instrument. Thus, the corpus would remain intact for ultimate distribution to the remainderman.

(2) The alleged annuity arrangement did not give taxpayers a downpayment, interest on the deferred purchase price, or security for its payment.

(3) The only source of the payments to taxpayers was the income from the property they had transferred to the trust.

(4) There was no relationship between the purported sales price and the value of the stock transferred.

In evaluating all of these factors, the Court concluded that the trust acted as a mere conduit for the distribution of trust income to petitioners.

In *La Fargue*, pursuant to an overall plan, taxpayer established a trust with an initial corpus of $100, naming her daughter as beneficiary. Taxpayer's sister, the son of friends, and her lawyer were the trustees. Two days later, taxpayer transferred various assets to the trust in return for equal annual payments for life from the trust. While there was not any precise tie-in between the income of the trust and the annuity payments, this Court did mention that the transferred property was the sole source of the annuity payments to taxpayer. There also was no relationship between the present value of the purported sales price and the fair market value of the transferred properties.

This Court ruled that the transfer of assets was not a sale or exchange for an annuity but rather a transfer in trust with a reserved interest. In so holding, the Court also mentioned that there were informalities in the trust's administration. The

taxpayer had continued to receive dividends on the transferred stock; the taxpayer did not assert her contractual rights when her annuity payments were late; and the taxpayer expected to be kept informed on trust matters, even though she did not retain any control over the trust.

The Ninth Circuit reversed, holding that the "informalities" the Tax Court found did not justify looking through the formal terms of the annuity agreement. The Ninth Circuit also held that *Lazarus* did not apply because the annuity payments were not a conduit for the trust's income.

In *Stern*, as an integral part of taxpayers' (Sidney and Vera Stern) financial and estate plan, two foreign trusts were created (the Hylton Trust and the Florcken Trust). The terms of the two trusts were essentially identical. The trustee of both trusts was an independent foreign bank, and taxpayers and their issue were the named beneficiaries of the respective trusts.

The trust instruments empowered the trustee to guarantee taxpayers' loans, to lend them money on an unsecured, interest-free basis, and to freely distribute corpus or income to them. In addition, the Hylton Trust gave Sidney, and the Florcken Trust gave Vera, a limited power of appointment over the trust properties and permitted them to replace the trustee without cause.

Shortly after the trusts were created, taxpayers transferred substantial blocks of stock to these trusts in exchange for lifetime annuities. The annual annuity payments were computed by dividing the fair market value of the stock by the appropriate annuity factor listed in the tables set forth in section 20.2031–10(b), Estate Tax Regs. Although the foreign bank trustee administered both trusts, taxpayers and their attorney played active roles in the trusts' affairs.

This Court found that the transactions did not constitute sales in exchange for annuities, but were transfers in trust with retained rights to annual payments. On appeal, the Ninth Circuit reversed, relying on their decision in *La Fargue*. They held that a valid annuity had been established, and emphasized that lack of tie-in between the amount of the annuity and the trust's income was essential to their analysis. In arriving at their decision, the court stated that the transfers of stock to a trust may not be recharacterized simply because

the transfers were part of a prearranged plan designed to minimize tax liability or because the transferred property constituted the bulk of the trust assets. The court also mentioned that taxpayers did not possess the degree of control over the trusts to justify treating them as having retained an income interest in the transferred properties.

In the instant case, respondent insists that the decedent failed to purchase an annuity. He alleges that the following factors support his contention:

(1) Many of the payments made to the decedent by the trustee were untimely; other payments due under the terms of the agreement were simply not made to the decedent.

(2) Some interest payments on the transferred assets were made to the decedent rather than to the trustee.

(3) Some of the assets were not transferred to the trustee until after September 1975.

(4) The annuity agreement was not financially guaranteed by the trustee, and accordingly all payments were to be charged to the transferred property.[8]

(5) Decedent sent a letter to the trustee expressing her desire that he consult with her son and her attorney with respect to trust investment decisions.

This case is appealable to the Ninth Circuit, which reversed us in *La Fargue* and in *Stern.* We find that the facts here are substantially similar to those in *La Fargue* and in *Stern.* Further, the informalities in the trust and annuity adminis- tration were no more egregious than those we found in *La Fargue.* Therefore, given our decision in *Golsen v. Commission- er,* 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we believe that we are compelled to hold that the decedent entered into a valid annuity agreement with the Chai Trust. In so holding, we express no opinion with respect to whether, aside from the application of the *Golsen* rule, we would follow the decision of the Ninth Circuit in *La Fargue* and in *Stern.*[9]

---

[8]We found in our findings of fact that the annuity agreement was financially guaranteed by the trustee.

[9]This Court recently in *Benson v. Commissioner,* 80 T.C. 789 (1983), applied the *Golsen* rule in holding that since the *Benson* case was appealable to the Ninth Circuit, the *La Fargue* decision would be controlling. As a result, the Court in *Benson* found that the transaction constituted the purchase of an annuity contract. The facts in *Benson* indicated the following: (1) The trustee was independent; (2) there were several late payments; (3) the annuity payments were not always

The next issue presented is whether the decedent erred in using the actuarial tables set forth in section 20.2031-10, Estate Tax Regs., in valuing her annuity. Respondent maintains that the decedent's physical condition at the time she entered into the annuity agreement with the trust should have been considered. His position is that the annuity's value should have been determined from the decedent's actual life expectancy, not from her life expectancy as set foth in the actuarial tables. ·

The actuarial tables are provided as an administrative necessity and their general use has been readily approved by the courts. See *Ithaca Trust Co. v. United States*, 279 U.S. 151 (1929); *Simpson v. United States*, 252 U.S. 547 (1920). This need for a simplified administration of the tax laws may result in occasional individual discrepancies from the use of the actuarial tables. *McMurtry v. Commissioner*, 203 F.2d 659, 667 (1st Cir. 1953). In exceptional circumstances, however, courts will permit departure from the actuarial tables. *Bank of California v. United States*, 672 F.2d 758, 759–760 (9th Cir. 1982); *Continental Illinois National Bank & Trust Co. of Chicago v. United States*, 504 F.2d 586, 593 (7th Cir. 1974); *Miami Beach First National Bank v. United States*, 443 F.2d 116, 120 (5th Cir. 1971).

The Ninth Circuit has held that any party contending that the actuarial tables are inapplicable bears the burden of proving why the court shall deviate from those tables. *Bank of California v. United States, supra* at 759; *Estate of Christ v. Commissioner*, 480 F.2d 171, 172–173 (9th Cir. 1973). Respondent cites various Tax Court decisions in support of his argument. We believe that a brief synopsis of those cases is in order.

In *Estate of Jennings v. Commissioner*, 10 T.C. 323 (1948), the life tenant on the valuation date was suffering from a complete loss of memory and almost total paralysis as the result of a cerebral attack. At the valuation date, the life tenant had a life expectancy of not more than 1 year and in

---

uniform in amount; (4) the annuitant occasionally requested and received advances of the annuity; (5) the annuitant received an interest-free loan from the trust, which was never repaid, and (6) the amount paid for the annuity ($371,875) significantly exceeded the value of the annuity (by $194,374.08). The facts in the instant case are almost identical to these facts which the Court in *Benson* found were sufficient to require application of the *Golsen* rule.

fact died 2 months later. In *Estate of Hoelzel v. Commissioner,* 28 T.C. 384 (1957), the beneficiary at the time of decedent's death was inflicted with an incurable and inoperable cancer of the lung. Her surgeon and physician were both of the opinion that she would die within 1 year. *Estate of Butler v. Commissioner,* 18 T.C. 914 (1952), involved a decedent's widow who was inflicted with cancer, which was in an inoperable form at the date of the decedent's death. The facts known at that time also indicated that her actual life expectancy was less than 1 year. In *Huntington National Bank v. Commissioner,* 13 T.C. 760 (1949), the life tenant was more than 80 years old and had been an almost hopeless invalid for the last 2 years of her life. Her physician testified that the life tenant's physical condition was such that, at the time of decedent's death, he expected her to die at any moment. Finally, in *Estate of Denbigh v. Commissioner,* 7 T.C. 387 (1946), while medical experts had testified to a life expectancy of from 1 to 2 years, the life beneficiary was suffering from cancer in an inoperable form at the valuation date.

These opinions permitted departure from use of the tables. In the majority of these opinions it was shown that the individual's maximum actual life expectancy was 1 year or less.

These opinions are distinguishable from the instant case. At the time of decedent's execution of the annuity agreement, it was not established that her maximum life expectancy was 1 year or less. In addition, while the decedent underwent open-heart surgery 5 days later, she survived the operation by 1 year and 5 months. Furthermore, the uncontroverted testimony of decedent's physician was that as of late 1975 decedent should live several more years, possibly even 5 more years.

Our situation is less extreme than the one in *Continental Illinois National Bank & Trust Co. of Chicago v. United States, supra.* There, the decedent was 75 years old and had incurable cancer of the colon. She died on March 28, 1966, one month after the February 21 valuation date. Despite testimony by physicians that she would live for no more than 6 months, the court found that it was possible that she could have outlived the valuation date by 1 year. Hence, the court ruled that the decedent's physical condition was irrelevant and that the

actuarial tables should be used to value the life estate in question.

The evidence demonstrates that the decedent's death was not clearly imminent or predictable at the time she entered into the annuity agreement. Only where death is imminent or predictable will departure from the tables be justified. See *Miami Beach First National Bank v. United States, supra* at 120. Therefore, we rule that the decedent properly used the actuarial tables in valuing her annuity. The proper use of the tables, along with the testimony of Mr. Steinberg, convinces us that adequate and full consideration was given for the annuity.[10]

*Decision will be entered under Rule 155.*

---

[10]Respondent alternatively argued that the assets were transferred to the trust in contemplation of death, and, accordingly, should be included in the decedent's estate. Our finding that a legally binding annuity was entered into for adequate and full consideration in money or money's worth precludes application of sec. 2035(a) and (b).