W. M. YEAMAN and Ramona Yeaman, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 76–2927.

United States Court of Appeals, Ninth Circuit.

Oct. 17, 1978.

George Constable (argued), Seattle, Wash., for plaintiffs-appellants.

Ernest J. Brown, Atty. (argued), Dept. of Justice, Washington, D. C., for defendant-appellee.

Before DUNIWAY and CHOY, Circuit Judges, and GRANT,* District Judge.

GRANT, District Judge:

We are here presented with the question whether funds derived from oil and gas leases should be characterized as long-term capital gain from the sale of those leases, or as proceeds from the production of oil and considered ordinary income, subject to an allowance for depletion.

Plaintiffs filed a complaint claiming that they were entitled to refunds for the years 1970 and 1971, denied by the I.R.S. The district court determined that plaintiffs were not entitled to capital gain treatment concerning such proceeds and, consequently, were not entitled to the claimed refunds. We affirm.

This dispute stems from transactions occurring during the 1950's. In July 1951, the holder (A. G. Bailey Co., Ltd.) of an undivided 37.5 per cent interest in two oil and gas leases on property in the province of Alberta, Canada, entered into an agreement (entitled the "Buck Lake Participation Agreement") with an individual named R. M. Hardy, Sr., whereby Hardy acquired a 17.5 per cent interest in the undivided 37.5 per cent interest in the "net proceeds of production" from all subsequent drilling. In August 1951, Hardy entered into an agreement with Mr. Yeaman and a third party, whereby the three parties would share equally in the net proceeds of production as provided in Hardy's earlier agreement with the Bailey Company. At this point in time, Mr. Yeaman had a two per cent interest in the oil and gas leases (37.5% × 17.5% × 33.3%).

On 13 December 1954, Mr. Yeaman, Mr. Hardy, and the third party entered into an agreement, called an assignment, with the Crow's Nest Pass Coal Company. Under this agreement, Yeaman "assigned" his interest to Crow's Nest in consideration of his share of $149,222.66, plus 50 per cent of the future "net money profit" derived from his interest. The assignment defined the term "net money profit" as the "net proceeds of production" under the earlier Buck Lake Participation Agreement between the Bailey Company and Hardy. One month later, on 13 January 1955, the parties signed an "Agreement Amending Assignment", wherein it was provided that if the owner disposed of any lands relating to the oil and gas leases, the "Assignee shall promptly pay to the assignor one-half of all moneys received. . . ." The effect of this amended assignment is disputed by the parties and is the decisive issue in this case.

From 1954 through 1969, plaintiffs filed their income tax returns and reported the funds received from Crow's Nest as capital gains. In 1970 and 1971, plaintiffs received $61,421.36 and $69,974.26, respectively, as proceeds from the Crow's Nest assignment, and reported the funds as long-term gain from the sale or exchange of a capital asset. Upon audit, the I.R.S. determined that these amounts constituted income from mineral production, taxable as ordinary income, with an allowance for depletion, and assessed plaintiffs deficiencies. The deficiencies were paid, claims for refund were

---

* Senior District Judge Robert A. Grant of the United States District Court for the Northern District of Indiana, sitting by designation.

denied and a complaint was filed in the district court. The case was tried to a jury but the court granted the defendant's motion for a directed verdict. Thereafter, the plaintiffs instituted this appeal.

Plaintiffs argue that under the assignment to Crow's Nest, Mr. Yeaman made a sale of all his interest in the oil and gas leases and that he retained no economic interest therein; and that, therefore, plaintiffs are entitled to capital gains treatment on the funds received annually from Crow's Nest. In plaintiffs' opening brief, only one case is cited to support this contention, *Helvering v. Elbe Oil Land Development Co.*, 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904 (1938) *reh. denied* 303 U.S. 669, 58 S.Ct. 762, 82 L.Ed. 1125 (1938). It is claimed by plaintiffs that the facts of *Elbe Oil* are identical to those of the instant case. Without any further association to the case at bar, plaintiffs summarized the holding of *Elbe Oil*: That the transaction was an absolute sale of all properties, including the oil and gas in place, and the court was unable to conclude that a provision for additional payments qualified the effect of the transaction.

Furthermore, plaintiffs argue that while they had an economic interest in the contract with Crow's Nest, they had no right to the oil as such. This economic interest in the contract is explained as simply a "right to one-half of Crow's Nest's profits if any", without any right to drill wells on the property. (Appellants' brief p. 12.) Plaintiffs cite a General Counsel's Memorandum [1] apparently to support the contention that in having only a right to the net profits of Crow's Nest, they retained no economic interest in the oil in place. In that General Counsel's Memorandum, the distinction is made between "a right to share in production, or the gross income therefrom, [which] is very different from the right to share in the net income of the producer (a right measured not by the production of mineral, as such, but by the degree of success in the operation of such a right owned by another)." It is further stated therein:

That rights to share in the oil produced are analogous to rights to share in gross proceeds derived from the sale of oil produced has been repeatedly stated by the highest Court. It would seem to follow that a right to a share of the proceeds from the sale of oil produced would give the payee ownership of a corresponding depletable economic interest without regard to conveyancing formalities . . . . For example, an instrument purporting to be a "lease" of oil or mineral lands, which gave a "lessee" a right to explore for and produce all the oil or mineral found thereon and required the lessee to pay the "lessor" *only* a share of the net profits derived from the operation (as distinguished from a share of the product or the proceeds from the sale of the product), would leave the lessor without a depletable economic interest in the oil or mineral in place . . . ." (Emphasis added.)

p. 222. Plaintiffs argue that the assignment entitled them only to a share of the net profits derived from the operation.

■ Defendant maintains that the effect of the assignment to Crow's Nest was merely to transfer one-half of plaintiffs' interest in the proceeds of production from the oil leases, and that this constituted a retention of an economic interest. We agree. *Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933) is the case which first defined an economic interest: "every case in which the taxpayer has [1] acquired, by investment, any interest in the oil in place, and [2] secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." 287 U.S. 551, 557, 53 S.Ct. 225, 226, 77 L.Ed. 489. The Court further held that the terminology of the instrument of transfer, whether it be in terms of a lease, assignment or sale, etc., is irrelevant. In *Palmer*, the Court found that the lessor of an oil lease had retained an economic interest and was, therefore, allowed to deduct a depletion allowance from the oil proceeds. *Commissioner of*

---

1. G.C.M. 22730, C.B. 1941–1, p. 214.

*Internal Revenue v. Southwest Expl. Co.*, 350 U.S. 308, 314, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

There is no question of Mr. Yeaman's economic interest in the oil prior to the assignment. By the assignment to Crow's Nest, Mr. Yeaman did no more than transfer one-half of his interest, retaining 50 per cent of his interest in the net proceeds of production. In the sixth paragraph of the assignment, dated 13 December 1954, the expression "net money profit" is defined as the net proceeds of production as used in the prior Buck Lake Participation Agreement. The retention of an economic interest is further established by the agreement of 13 January 1955, wherein the parties amended the original assignment and agreed that Yeaman, Hardy, and the third party were guaranteed 50 per cent of all the money received from any disposition or sale of the land covered by the December 1954 agreement (original assignment). If plaintiffs were entitled to any money received upon sale of the land, surely they had retained an economic interest. Because of this retention of an economic interest and plaintiffs' receipts from oil production, the *Palmer v. Bender* test is satisfied. Therefore, the proceeds constitute ordinary income, subject to depletion, and not capital gain. *See Kirby Petroleum Co. v. Commissioner of Internal Revenue*, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343 (1946); *Commissioner v. Southwest Expl. Co., supra; Anderson v. Helvering*, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1940).

We find plaintiffs' reliance on the *Elbe Oil* case to be misplaced. Later Supreme Court cases have limited *Elbe Oil* to its own facts and it can be distinguished by further pointing out that the focus of *Elbe Oil* was on the character of fixed installments from the complete sale of oil property, and not subsequent production payments of indefinite duration. See *Burton-Sutton Oil Co. v. Commissioner of Internal Revenue*, 328 U.S. 25, 36, 66 S.Ct. 861, 90 L.Ed. 1062 (1946); *Kirby Petroleum Co. v. Commissioner of Internal Revenue, supra.*

Plaintiffs statement that all they owned was an interest in the net profits of Crow's Nest is incorrect. We find that the assignment nowhere provided any interest in the net profits of the Crow's Nest Company, which might be derived from efficient operations unrelated to oil production. Rather as previously mentioned, the assignment provided in the sixth clause, that the expression "net money profit" shall mean the net proceeds of production "derived from the Buck Lake Participation Agreement."

Finally, we find no merit in plaintiffs' other arguments:

■ (1) Plaintiffs argue that the trial court erred in excluding testimony and exhibits relating to the intention of the parties that all interest in the leases was to be sold. Plaintiffs' intent to have a complete transfer of interest is nothing more than an attempt to obtain favorable capital gains treatment, hardly relevant to the characterization of income—a determination controlled by whether the various agreements allowed plaintiffs to retain an economic interest. In *Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1959), the Supreme Court dealt with the problem of whether a transfer of property could be characterized as a gift for tax purposes. The statements of the Court in *Duberstein* have relevance for the case at bar, in that "the donor's characterization of his action is not determinative—that there must be an objective inquiry as to whether what is called a gift amounts to it in reality. It scarcely needs adding that the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter." 363 U.S. 278, 286, 80 S.Ct. 1190, 1197, 4 L.Ed.2d 1218. In the case at bar there has been an objective inquiry as to whether what is called a sale, without retention of an economic interest, amounts to it in reality. The trial court found that plaintiffs had retained an economic interest, and their expectations to the contrary were irrelevant. Therefore, the trial court did not err in excluding such evidence.

 (2) Plaintiffs argue that it was error for the trial court to exclude evidence concerning the fact that the I.R.S. had, prior to 1970, audited and accepted plaintiffs' returns with the oil proceeds reported as capital gain. The prior I.R.S. inaction has no bearing on the issue herein. *Continental Insurance Co. v. United States,* 474 F.2d 661, 200 Ct.Cl. 552 (1973), is cited by plaintiffs to establish that it is trial court error to refuse to admit evidence of past I.R.S. inaction. We read *Continental* as holding that I.R.S. inaction is not entitled to great weight but may, in some cases, be a factor to be considered. In the case at bar, we hold that the trial court did not err in finding such evidence irrelevant and inadmissible. Prior I.R.S. inaction or even affirmative acquiescence may be corrected retroactively even where a taxpayer may have relied to his detriment on the Commissioner's mistake. *Dixon v. United States,* 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1964). In the case at bar, plaintiffs at no time alleged detrimental reliance. Even an estoppel argument would not help plaintiffs. In *Automobile Club v. Commissioner of Internal Revenue,* 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1956), the Court held that, "The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law." 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746. In the case at bar, any prior misinterpretation of the tax effect of the relevant transactions are mistakes of law which can be corrected by the Commissioner without obstruction by the doctrine of equitable estoppel. Therefore, the trial court did not err in excluding evidence of prior I.R.S. inaction.

In determining whether a verdict should have been directed, an appellate court applies the same standard as does the trial court originally. As Wright and Miller suggest,[2] a good statement of the test is quoted from a decision of the Second Circuit:

> Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

*Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970).

We hold that in applying the test to the case at bar, there can be but one conclusion as to the verdict that reasonable men could have reached, and the trial court correctly reached that conclusion.

AFFIRMED.

---

2. Wright & Miller, *Federal Practice and Procedure*: Civil §§ 2524, 2536.