MARION B. BENSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6543–78, 7979–79, 9601–80.    Filed April 26, 1983.

*Jed Gladstein*, for the petitioner.
*David L. Denier*, for the respondent.

FORRESTER, *Judge*: Respondent has determined deficiencies of $4,280.20, $3,863, and $2,452 in petitioner's Federal income taxes for the years 1974, 1975, and 1976, respectively, and an addition to tax pursuant to section 6653(a)[1] of $214.01 for 1974. Respondent having conceded the section 6653(a) addition to tax, the following issues remain for our decision:

(1a) Whether a transaction between petitioner and a trust established by her was an exchange of securities for an annuity, or a transfer of securities to the trust with a reservation of the right to an annual payment;

(1b) If we find a bona fide annuity, what is petitioner's investment in the contract for purposes of calculating the section 72 exclusion ratio;

(2) Whether petitioner is entitled to a deduction for certain investment counseling fees for 1974;

---

[1] All statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise stated.

(3) Whether petitioner is entitled to a capital loss carryover for 1974.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Marion B. Benson (hereinafter Marion) resided in Portola Valley, Calif., when the petition in this case was filed. Her income tax returns for 1974, 1975, and 1976 were timely filed with the Internal Revenue Service Center in Fresno, Calif.

## Issue 1. Annuity Payments

On November 30, 1964, Marion executed a power of attorney empowering her attorney, Harry Margolis, to create a trust (hereinafter the ABC trust) with the Aruba Bonaire Curacao Trust Co., Ltd. (hereinafter ABC), as trustee, and to execute an annuity agreement between Marion and ABC in its capacity as trustee. Marion and Margolis intended the trust and annuity agreements to be executed contemporaneously.

Margolis and ABC executed trust[2] and annuity agreements which read in pertinent part as follows:

ANNUITY AGREEMENT

*    *    *    *    *    *    *

2. ABC is entering into this Annuity Agreement on behalf of a Settlement of which ABC is the present Trustee.

3. The sole consideration for the transfer of the securities from Benson to ABC is the present Annuity Agreement. There is no independent security for this Annuity Agreement.

4. The parties agree that this Annuity Agreement is effective as of this date with the transfer of the securities to Grace National Bank of New York for the account of ABC and further agree that the fair market value of said securities on this date is $371,875.00.

5. This Agreement has been predicated upon the accepted actuarial life expectancy of Benson as being 15 years.

6. ABC shall pay to Benson the sum of TWENTY-FOUR THOUSAND SEVEN HUNDRED NINETY-ONE AND 67/100 DOLLARS ($24,791.67) each and every twelve months, beginning with January 1, 1965, and running for the lifetime of Benson.

7. This Agreement shall terminate in all events on the death of Benson.

---

[2]The annuity agreement was executed on Dec. 14, 1964, but due to an oversight by ABC, the trust agreement was not executed until May 14, 1965.

\*     \*     \*     \*     \*     \*     \*

9. No security of any kind has been reserved for this Annuity Agreement, and it is understood that ABC has full right to dispose of the securities received by it or to otherwise deal with such securities in any way ABC wishes without any consultation with or responsibility to Benson other than as set forth in this Agreement.

10. No gift is intended by Benson or by ABC and the parties agree to adjust payments to show, both by number of payments and size of payments, an exact cost of the annuity equal to the actuarially expected return.

11. The annual payment required hereunder shall be made quarterly and on or before the 15th day of January, April, July and October, with no single payment being less than FIVE THOUSAND DOLLARS ($5,000.00). Default in any payment by ABC to Benson shall carry seven per cent (7%) interest from the date on which the payment was due. Should such default continue for more than thirty (30) days beyond the end of any quarter, ABC hereby authorizes any attorney to appear for it in any suit on this Agreement in any court of record in the United States and does hereby waive issuance and service of process in any suit initiated by such attorney and hereby authorizes such attorney to confess judgment in favor of Benson in the amount provided for and then due under this Agreement, together with costs of suit. From and after Benson's death, this specific waiver shall be of no further force and effect as to any sums not yet due.

\*     \*     \*     \*     \*     \*     \*

### TRUST AGREEMENT

\*     \*     \*     \*     \*     \*     \*

### ARTICLE I

Trustor has delivered to Trustee FIVE ($5.00) Dollars as the initial corpus of this Trust.

### ARTICLE IV

The Beneficiaries of this Trust shall be HAROLD A. KAZMANN, FRANCES B. KAZMANN, THEODORE R. BAYARD, NINA INEZ RICH-ARDS, ALEXANDRA CRAWFORD GARRETT, CYNTHIA CRAWFORD LICHTENSTEIN, MARION K. RICHARDS, ANGELA BAYARD, MARSHA BAYARD, and MARION BAYARD. Said named beneficiaries shall be the Primary Beneficiaries of this Trust. Issue of any of the named Beneficiaries shall themselves become Beneficiaries if not otherwise named herein. All other blood relations of Trustor and any living legal spouse of any named Beneficiary shall also be included as Beneficiaries hereunder. The term issue shall include anyone legally adopted by any of the named Beneficiaries, effective immediately upon the judicial confirmtion of the parent-child relationship.

Each and every interest created hereunder is an immediate and vested and indefeasible interest.

## ARTICLE V

The Trustee is to set aside the first TEN THOUSAND DOLLARS ($10,000.00) of corpus for my brother, THEODORE R. BAYARD. The next FIFTY THOUSAND DOLLARS ($50,000.00) of corpus is to be set aside for my three BAYARD nieces. The remainder of corpus shall be held one-half ($\frac{1}{2}$) for the benefit of DR. and MRS. HAROLD A. KAZMANN and their daugther MARION K. RICHARDS and their granddaughter NINA INEZ RICHARDS, two-sixteenths ($\frac{2}{16}$) for ALEXANDRA CRAWFORD GARRETT, two-sixteenths ($\frac{2}{16}$) to CYNTHIA CRAWFORD LICHTENSTEIN and the remaining four-sixteenths ($\frac{4}{16}$) to my three BAYARD nieces.

From and after the moment of my death, all corpus shall be distributed to each Beneficiary hereunder who has reached the age of twenty-one (21) and distribution shall continue to each Beneficiary as he or she becomes 21 years of age until the trust is finally terminated, provided only that any named Beneficiary may in writing waive his right to such distribution and may do so in whole or in part without waiving his lifetime interest but all such waivers must be made prior to the moment of my death.

\* \* \* \* \* \* \*

## BASIC TRUST AGREEMENT

\* \* \* \* \* \* \*

## ARTICLE I

### RIGHT TO ADD TO THE TRUST

Any and all persons shall have the right to add property of any kind and character to this Trust by Will or by deed with the consent of the Trustee. The Trustee is instructed to reject any such addition which would in any way invalidate the Trust as it exists as of the time such addition is offered.

## ARTICLE II

### TRUST IS IRREVOCABLE

This is an irrevocable Trust and, effective with the signing of this Agreement, the Trustor shall have relinquished all rights in connection with the Trust and its assets, except as specifically provided herein, or as may result from the operation of law.

## ARTICLE III

### TRUST NOT AMENDABLE

This Trust Agreement shall not be subject to amendment.

## ARTICLE IV

### DESIGNATION AND DESCRIPTION OF BENEFICIARIES

* * * The Trustor is expressly excluded, both directly and indirectly, from becoming a Beneficiary. Any children who may hereafter be born, who come within any of the definitions of Beneficiaries hereunder, shall be included as additional Beneficiaries.

*　　　*　　　*　　　*　　　*　　　*　　　*

## ARTICLE V

### PROVISIONS RE ACCUMULATION AND DISTRIBUTION

This Trust is in part an accumulation Trust, and in part for current distribution of income and corpus. Distributions, and matters relating thereto, shall be governed as set forth in the total Trust Instrument.

*　　　*　　　*　　　*　　　*　　　*　　　*

* * * *Corpus and All Other Income.*

Corpus and all currently nontaxable income shall be accumulated during the lifetime of every named Beneficiary of this Trust and for a period not to exceed twenty-one (21) years after the death of such last named Beneficiary. Should any Beneficiary be able at any time during the life of this Trust to establish to the satisfaction of the Trustee that any portion of corpus or income may be distributed to such Beneficiary without such Beneficiary or the Trust incurring taxation of any kind or character under the tax laws of any national state, the Trustee shall in such event distribute to such Beneficiary so much of the corpus or income as the Trustee in its exclusive discretion determines to be necessary in relation to the education, support, maintenance and health, or to the maintenance for any such Beneficiary of his or her accustomed standard of living. Such decision shall be made by the Trustee in the light of the over-all situation of all Beneficiaries living at the time in question and, in cases of need, within these standards, the Trustee may utilize any or all of the Trust assets, and no precept of equality need apply. Should the Trustee, under this provision, distribute the entire corpus and income of the Trust in any one year, when that is possible, the Trust shall then be terminated.

* * * *Emergencies.*

The foregoing provisions express collectively the mode, manner, terms and conditions intended to govern the distribution of all corpus and income of the entire Trust hereby established under normal circumstances and conditions. Emergencies and conditions of special need, however, constitute special categories not contemplated under such foregoing provisions and not intended to be governed thereby and which shall be separately and specially governed as provided below. The additional powers given the Trustee under conditions of emergency are intended to be limited to such special emergency circumstances but, in such special emergency circumstances, shall supersede and prevail over any other provision set forth in this Trust. The

Trustee shall have the power and is instructed to depart from the program set forth above in any emergency for any Beneficiary of the Trust hereby established. Trustor intends here to rely on the mature judgment of an experienced Trustee activated by the best interests of all of the Beneficiaries.

In any such emergency, the Trustee should do anything and everything to assist the necessitous Beneficiary affected, and should make any distributions of income or corpus, or both, from the Trust hereby established, which Trustee, in its sole judgment, in the premises may deem advisable. Action, even to the full consumption of the entire Trust, in any manner, shall be taken if the emergency requires it. Equality among the Beneficiaries is of little consequence in an emergency.

* * * *Special Need.*

In the absence of any emergency, any Beneficiary may apply to the Trustee in writing to request distribution of corpus or income upon the basis that such corpus or income is necessary to the Beneficiary in relation to education, support, maintenance and health, or to enable any such Beneficiary to maintain his or her accustomed standard of living. In cases of need, within these standards, the Trustee may utilize any or all of the Trust assets, and no precept of equality need apply, provided only that the Trustee shall in its sole judgment determine that such distribution of corpus or income is then consistent with the general interests of the Trust and all of the Beneficiaries.

*　　*　　*　　*　　*　　*　　*

ARTICLE VII

GENERAL PROVISIONS RE TRUSTEE AND TRUSTEE POWERS

SPECIFIC TRUSTEE-POWER PROVISIONS.

* * * *Allocation of Assets.*

The Trust hereby established may be divided into separate, subdivided, and subordinate trusts or shares wherever such breakdown will, in the sole discretion of the Trustee, simplify administration or avoid difficulty among Beneficiaries or better permit the carrying out of the intent of the Trustor. The Trustee may do so without being required to make a physical segregation or division of assets in any respect or manner. The Trustee may allocate undivided interests in property to any such subdivided, subordinate trusts or shares, or may allocate different properties to any such at such valuations as it may determine. Except as heretofore otherwise stated, each such subdivided share of the Trust estate shall constitute a separate trust for all purposes of law.

*　　*　　*　　*　　*　　*　　*

* * * *Trustee to Consult.*

Wherever and whenever it deems it desirable, the Trustee is urged to consult with the Beneficiaries and with their counsel, accountants, and business

advisors. The Trustee is not required to seek any such consultation, nor shall the Trustee be bound by any recommendations which any of the persons named may suggest.

\* \* \* \* \* \* \*

\* \* \* *Relationships with Trustor.*

Under no circumstances shall the Trustor have any interest in any investment made by the Trustee, other than such legal interest as would a stranger to the Trusts in the particular transaction in question. The Trustee is authorized to deal with the Trustor, to purchase property from Trustor, or sell property to Trustor, but always at the fair market value of such property, and for an adequate and full consideration in money, or money's worth. Under no circumstances shall this paragraph be construed as conferring any power upon Trustor to require the Trustee to deal with Trustor in any manner, or to give the Trustor any power to reacquire the Trust corpus, or any part thereof, by substituting other property of an equivalent value. Trustor specifically authorizes and expects the Trustee to cooperate with the Executor or Administrator of Trustor's Will, or of the Wills of any of the Beneficiaries of this Trust, to the end that ready cash shall be available wherever it is needed among the members of the family. This cooperation between the Trustee and Executor or Administrator shall be generous, but at all times shall be conducted on a businesslike basis. Such cooperation shall have as its objective the over-all benefit of the Beneficiaries of this Trust.

\* \* \* \* \* \* \*

\* \* \* *Relations with Beneficiaries, Etc.*

The Trustee shall enter into financial transactions with the Trustor, Trustee, any Beneficiary, or anyone else, only for adequate consideration and upon adequate security. As the sole exception to this policy, the Trustee may loan trust assets to any Beneficiary, with or without security, and without interest, for a period not to exceed the term of the Trust, and otherwise consistent with the terms hereof. Any such non-financial transaction involving a loan of Trust assets to any Beneficiary shall be approached by the Trustee with caution.

On December 14, 1964, Marion transferred to ABC, pursuant to the annuity agreement, securities with a fair market value of $371,875. Her basis in these securities was $231,860.12.

Marion relied solely on the advice of Margolis in entering into the trust and annuity agreements. She did not consider purchasing a commercial annuity.

Between 1965 and 1976, Marion received quarterly annuity payments totaling $24,791.67 per year, except that she received $24,000 in 1970 and 1972, and $25,583.34 in 1974. On several occasions, Marion's scheduled quarterly payments

were late. These missing and late payments gave Marion rights as a creditor against ABC under the annuity agreement, but she never asserted those rights.

On infrequent occasions Marion requested and received advances against her annuity payments.

In November 1977, the ABC trust loaned Marion $5,000. This loan has not been repaid, nor has Marion paid interest to the trust.

Some time prior to the years in issue, Marion directed that an educational fund of $50,000 be set up from the ABC trust's assets for the benefit of three of her nieces, and ABC subsequently made various payments from this fund to the nieces or their parents.

In December 1976, ABC sent a $5,000 check to Marion's sister, Frances Kazmann, who was in financial difficulty because her husband was ill. Also in December 1976, Frances received from ABC a $3,500 check to be used for the education of Nina Richards, her granddaughter. These funds were never repaid to the trust.

In February 1977, Marion, concerned about the financial problems of her sister, acceded to Margolis' suggestion that he request ABC to advance Frances $1,000 a month from the ABC trust. In compliance with Margolis' request, ABC sent Frances $1,000 checks each month from March 1977 to March 1979.

In April 1979, at Marion's behest, Margolis requested ABC to increase the amount of Frances' monthly checks to $2,000, and ABC complied with this request. Frances paid no interest on these advances from the trust, and was not expected to make any repayment.

Marion's life expectancy at the time she entered into the annuity agreement was 13.8 years.

Using U.S. Life Table 38 in section 20.2031-7(f), Estate Tax Regs., Norman Greenberg, respondent's actuary, calculated that Marion's annuity had a present value of $177,500.92 on December 14, 1964. The parties stipulated to the accuracy of Mr. Greenberg's calculations.

## Issue 2. Investment Counseling Fees

Marion claimed a $1,200 deduction on her 1974 income tax return for fees paid to Harry Margolis. This payment was made pursuant to a long-term agreement between Marion and

Margolis whereby Marion paid Margolis $100 a month for his services. This arrangement was entered into at the time that Margolis planned and executed the trust and annuity agreements, and was in force each year between 1965 and 1976.

In 1970, Marion deposited $45,000 with Margolis, who held it for her account, and credited her with interest at 8 percent per year. Margolis collected his $1,200 fee for 1974 by crediting to his own account $1,200 of the interest accrued on Marion's $45,000.

## Issue 3. Capital Loss Carryover

On her 1968 income tax return, Marion claimed a long-term capital loss of $2,589 from the sale of stock in Financial Associates, Inc. The claimed capital loss was carried over each year after 1968, and was not challenged by respondent until his audit of Marion's 1974 return.

### OPINION

## Issue 1. Annuity Payments

The grantor of a trust shall be deemed to own any portion of that trust the income of which may be distributed to him or held for future distribution to him. Sec. 677(a). A grantor treated as the owner of a trust or portion thereof under section 677 must include in income the income of the trust or portion thereof to the extent such income would be taken into account in computing individual income tax. Sec. 671. Respondent asserts, and petitioner denies, that Marion must be deemed the owner of the income of the ABC trust for purposes of sections 677 and 671.

In *LaFargue v. Commissioner*, 73 T.C. 40 (1979), affd. in part and revd. in part 689 F.2d 845 (9th Cir. 1982), we were faced with a trust-annuity arrangement extremely similar to the one now before us. There the taxpayer established a trust with a corpus of $100, naming her daughter as beneficiary. The taxpayer then executed an annuity agreement with the trustees, whereby she exchanged property worth $335,000 for an annuity of $16,508 a year. The actuarial value of the annuity was significantly less than the value of the property transferred. We found certain "informalities" in the administration of the trust: the issuers of stock transferred by the

taxpayer to the trust were not notified of the transfer for approximately 2 years, and consequently the taxpayer continued to receive dividends on this stock[3] after the date of transfer; the taxpayer did not assert her contractual rights to a penalty on occasions when her annuity payments were late; the taxpayer expected to be kept informed on trust matters, although she did not take an active role in investment decisions or hold power to manage the trust or control the trustees. Based on these informalities, and the fact that the annuity payments to the taxpayer were funded entirely by the assets she transferred to the trust (see *Lazarus v. Commissioner*, 58 T.C. 854 (1972), affd. 513 F.2d 824 (9th Cir. 1975)), we held that "the transactions involved herein did not constitute a transfer of property in exchange for annuity payments * * * but rather resulted in the creation of a trust." *LaFargue v. Commissioner*, 73 T.C. at 57.

The Ninth Circuit reversed, holding that the "informalities" we found did not justify looking through the formal terms of the annuity agreement between the taxpayer and the trust. "Taken as a whole, the facts clearly show that the fundamental transfer and annuity obligations of the contract were being met, and that taxpayer relinquished control over the property transferred." *LaFargue v. Commissioner*, 689 F.2d at 848. The Ninth Circuit also held that *Lazarus v. Commissioner, supra*, did not apply in *LaFargue* because the annuity payments were not a conduit for the income of the trust. *LaFargue v. Commissioner, supra* at 848.

The record before us discloses the same sort of "informalities" that troubled this Court in *LaFargue*: Marion occasionally received annuity payments late, but failed to seek the late payment penalties to which the annuity agreement entitled her; Marion occasionally requested and received advances on her annuity payments; the trust loaned $5,000 to Marion in 1977, without interest, in violation of the trust instrument.[4]

On the record before us we cannot find that the informalities in the administration of the ABC trust and Marion's annuity[5] were more egregious than those we found in *La-*

---

[3]This stock was a small fraction of the total assets transferred.

[4]"The Trustee is authorized to deal with the Trustor, to purchase property from Trustor, or sell property to Trustor, but always at the fair market value of such property, and for an adequate and full consideration in money, or money's worth." Basic Trust Agreement, art. VII.

[5]The trustee distributed significant sums of money to various trust beneficiaries, at

*Fargue v. Commissioner, supra.* Nor can we conclude that the Ninth Circuit would find the rationale of *Lazarus v. Commissioner, supra,* any more applicable here than in *LaFargue,* since respondent has conceded that the annuity was not a conduit for the income of the ABC trust.

This case is appealable to the Ninth Circuit, which reversed us in *LaFargue v. Commissioner, supra.* In *Golsen v. Commissioner,* 54 T.C. 742, 757 (1970), 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we stated:

it is our best judgment that better judicial administration requires us to follow a Court of Appeals decision which is *squarely in point* where appeal from our decision lies to that Court of Appeals and to that court alone. [Fn. refs. omitted; emphasis supplied.]

In tortured factual situations such as those involved in *La Fargue v. Commissioner, supra, Lazarus v. Commissioner, supra,* and the instant case, it is hard to say that one is "squarely in point" with the other, yet the similarities are striking and we believe we should not again elevate substance over form. We therefore hold that Marion was not the owner of any portion of the income of the ABC trust for purposes of sections 671 and 677, and that the payments received by Marion pursuant to the annuity agreement were bona fide annuity payments. In so holding, we express no opinion as to whether, aside from the application of the *Golsen* rule, we would follow the decision of the Ninth Circuit Court of Appeals in *La Frague.*

Section 72 permits annuitants to exclude from income an amount equal to the product of the annuity payments received in the taxable year and a fraction having as its numerator the annuitant's investment in the contract as of its starting date, and as its denominator the expected return under the contract as of such date. The parties disagree over Marion's investment in the contract for the purpose of calculating the section 72 exclusion ratio.

Petitioner argues that Marion's investment in the contract is $371,875, the amount she transferred to the trust pursuant to the annuity agreement.

Respondent contends that Marion's investment in the con-

Marion's request. These distributions were proper under the terms of the trust (Basic Trust Agreement, art. V), and do not constitute "informalities" of the kind discussed above. The educational fund set up for the benefit of three of Marion's nieces was also proper under the trust's terms. Basic Trust Agreement, art. VII.

tract is the present value of the annuity as of December 14, 1964, or $177,500.92[6] The remaining value ($194,374.08) transferred to the trust represents a gift from Marion to the trust beneficiaries, on respondent's analysis.

We have held that where property is exchanged for an annuity, the present value of which is substantially less than the value of the transferred property, the annuitant's investment in the contract is the present value of the annuity, on the date of the exchange, and the difference in value is deemed a gift to the transferee, absent proof to the contrary. *212 Corp. v. Commissioner*, 70 T.C. 788, 798 (1978); *Estate of Bell v. Commissioner*, 60 T.C. 469, 473 (1973); *Estate of Bartman v. Commissioner*, 10 T.C. 1073, 1078–1079 (1948).

Petitioner argues that we may not find a gift element in private annuity transactions, and that we must therefore treat the full fair market value of property exchanged for a private annuity as the annuitant's investment in the contract. Petitioner bases this argument on Congress' failure to enact certain proposed legislation in 1954.

H.R. 8300, 83d Cong., 2d Sess. 263–264 (1954), contained proposed section 1241, which read in pertinent part:

SEC. 1241. EXCHANGE OF PROPERTY FOR AN ANNUITY CONTRACT.
  (a) Treatment of Seller of the Property.—
    (1) If a taxpayer exchanges property (other than money) for a consideration which includes an annuity contract, the value of the annuity contract computed without regard to the financial condition of the obligor shall be included in the amount realized on such exchange. Such value shall be deemed the amount of premium and other consideration paid for purposes of section 72 (relating to annuities).

              *       *       *       *       *       *       *

  (d) Definitions.—
    (1) Exchange of property which includes an annuity contract.— For purposes of this section an exchange of property for an amount which is contingent on the life expectancy of the seller of the property shall be deemed an exchange for a consideration which includes an annuity contract. To the extent that a contract is deemed to be an annuity contract

---

[6]This figure, to which the parties stipulated, was calculated using U.S. Life Table 38 in sec. 20.2031–7(f), Estate Tax Regs., which the parties have agreed is applicable to annuities purchased prior to Jan. 1, 1971. See *212 Corp. v. Commissioner*, 70 T.C. 788, 798–799 (1978); *Estate of Bell v. Commissioner*, 60 T.C. 469, 474 (1973); *Dix v. Commissioner*, 392 F.2d 313, 315–316 (4th Cir. 1968), affg. 46 T.C. 796 (1966).

for purposes of this section, it will also be deemed to be an annuity contract for purposes of section 72.

The House Committee comment on proposed section 1241, H. Rept. 1337, 83d Cong., 2d Sess. 84–85 (1954), reprinted in 3 U.S. Code Cong. & Admin. News 4111 (1954), contains the following language:

(H) Private annuities (sec. 1241)

Private annuities involve the exchange of property for a promise on the part of the buyer to pay a life income. Presently, the tax treatment of these transactions is in an uncertain status due to conflicting court decisions.

Under the bill the capital gains tax is to be imposed on the seller of the property in the year of the exchange on any excess of the value of the annuity, plus other consideration received, over his basis for the property. The annuity is not to be discounted for the financial condition of the person agreeing to pay the annuity. Moreover, a taxable gift element may be recognized in the exchange. In addition to the capital gains tax, the seller of the property is to pay tax under the new annuity rule, using the value of the annuity to determine his exclusion.

Further comments appear at pages 4428–4431:

Sec. 1241. Exchange of property for an annuity contract

This is a new section which provides rules for handling the tax consequences of an exchange of property in return for a series of payments which are contingent upon the life expectancy of the seller of the property.

Subsection (a)(1) provides that the taxpayer who sells or exchanges property under such an arrangement must include in the amount realized on the sale or exchange the value of the annuity contract. This contract is to be valued by determining the amount that would be charged by a life-insurance company selling an annuity contract with similar payment terms. The value of this contract is not to be subject to a special discount for the financial condition of the particular obligor. The seller of the property shall treat as proceeds from the sale of a capital asset, in the year of sale, any excess of the amount realized including the value of the annuity over the basis of the property given up in the sale or exchange. This is a reversal of various court decisions including *Burnet v. Logan* (293 U.S. 404 (1931)). If the value of the property and other consideration given up in the exchange exceeds the value of the annuity and other consideration received the excess may be considered a gift in line with the court decisions in *Estate of Koert Bartman* (10 T.C. 1073), and other cases.

The Senate Finance Committee recommended rejection of proposed section 1241, stating, S. Rept. 1622, 83d Cong., 2d Sess. 116 (1954), reprinted in 3 U.S. Code Cong. & Admin. News 4621, 4749 (1954):

J. Private Annuities (sec. 1241 in House bill)

   (1) House changes accepted by committee

The bill as passed by the House, but not your committee's bill, formulated specific rules for the tax treatment of private annuities. So-called private annuities or noncommercial annuities involve the exchange of property for a promise on the part of the buyer to pay a life income. Presently, the tax treatment of these transactions is in an uncertain status due to conflicting court decisions.

(2) Changes made by committee

Your committee has not adopted this portion of the House bill. The objective of clarifying the uncertainty of the court decisions is praiseworthy. It was found, however, that the appliction of the rules of the House bill left some uncertainty in particular areas, notably in support contracts. It was considered preferable to give more attention to the operation of the proposed new rules in various types of situations before they were adopted.

The Senate voted to accept the Finance Committee recommendation that proposed section 1241 be rejected.

Petitioner's argument is unclear, but appears to be based on the following reasoning: proposed section 1241 approved cases finding a gift element in private annuity transactions in which the value of the property transferred was greater than the value of the annuity received; proposed section 1241 was rejected; therefore, Congress rejected the cases finding gift elements in private annuity transactions of the type described above.

Petitioner's interpretation of the import of Congress' rejection of section 1241 is mistaken. Section 1241 was intended to stop the appliction of the "open transaction" doctrine to private annuities, and thereby to require taxpayers transferring appreciated capital assets to private annuities to recognize capital gain at the time of such transfer. We read the language approving cases finding gift elements in private annuity transactions as meant to show that the change in the capital gains tax treatment of private annuity transactions contemplated by section 1241 did not entail any change in existing gift tax treatment of such transactions where the value of the property transferred exceeded the value of the annuity. Congress' rejection of proposed section 1241 thus was not a rejection of the principle that the excess in value of property transferred in exchange for an annuity over the value of the annuity should be treated as a gift, and therefore provides no support for petitioner's contention that the entire value ($371,875) of the stocks she transferred to the trust is her investment in the annuity contract.

Petitioner offered no evidence that her purchase of the annuity did not contain a gift element.[7] We therefore find that Marion's investment in the annuity contract for the purpose of calculating the section 72 exclusion ratio was $177,500.92.[8] The difference between Marion's investment in the contract and the total value of the property she transferred in exchange for the annuity was a gift to the trust beneficiaries.[9]

### Issue 2. Investment Counseling Fee

An individual may deduct ordinary and necessary expenses incurred for the management of property held for the production of income, or in connection with the determination, collection, or refund of any tax. Sec. 212. The parties dispute the deductibility of the fees Marion paid to Margolis in 1974.

Margolis held $45,000 on account for Marion in 1974, and credited her with interest thereon at 8 percent. It would seem natural to conclude that the fees paid Margolis by Marion were for the management of this $45,000. As respondent points out, however, Marion has made no such claim; indeed, Margolis, petitioner's only witness on this issue, testified that the $1,200 fee was attributable to services rendered to Marion when the trust and annuity agreements were planned and executed. This testimony is supported by the fact that Marion paid Margolis $1,200 a year for several years prior to the date on which she deposited the $45,000 with him. We are therefore unable to find that the $1,200 fee was incurred for the management of the $45,000 held for Marion's account by Margolis.

Alternatively, petitioner might argue (although petitioner's brief is silent on this point) that the fee related to tax

---

[7] The annuity agreement states that Marion intended no gift to the trust. This bare assertion in the annuity instrument does not prevent us from finding a gift where property worth $371,875 is exchanged for an annuity worth $177,500.92. See *Estate of Bell v. Commissioner*, 60 T.C. at 473.

We also note that Marion did not seek to ascertain the cost of comparable commercial annuities before entering into the annuity agreement, a factor we have found to indicate the presence of a gift element. *Estate of Bell v. Commissioner, supra* at 473.

[8] Since the amount Marion realized upon exchanging her property for the annuity ($177,500.92) does not exceed her adjusted basis in the property transferred ($231,860.12), no capital gain or loss is recognized. Sec. 1.1001–1(e)(2), example (2), Income Tax Regs.

[9] Respondent having asserted no gift tax deficiency, we need not consider the gift tax consequences of this transfer.

counseling supplied Marion by Margolis in 1965. We are convinced that Margolis did provide tax advice to Marion in 1965, but the burden is on petitioner to establish what portion of the fee is attributable to tax advice. Petitioner has made no attempt to meet this burden; accordingly, on this record we must uphold respondent's determination.[10]

## Issue 3. Capital Loss Carryover

A taxpayer claiming a capital loss carryover must be able to establish that he actually incurred the loss he wishes to carry over. The only evidence Marion offered to establish the capital loss she reported in 1968 was Margolis' testimony that the accountant who prepared her 1968 return was honest and competent. Such testimony does not suffice to carry petitioner's burden of proof. Since we cannot find that Marion suffered a capital loss in 1968, we must find for respondent on the capital loss carryover issue.[11]

*Decision will be entered under Rule 155.*

---

[10]Petitioner argues that respondent is precluded from disallowing Marion's claimed investment counseling fee deduction in 1974 because respondent accepted similar deductions in all other years between 1965 and 1976. This argument is without merit. *Yeaman v. United States*, 584 F.2d 322, 326 (9th Cir. 1978); *Rollert Residuary Trust v. Commissioner*, 80 T.C. 619 (1983); *Meneguzzo v. Commissioner*, 43 T.C. 824, 836 (1965); *Davies v. Commissioner*, T.C. Memo 1981–438.

[11]Petitioner points out on brief that respondent did not question Marion's capital loss deduction in 1968 or in any later tax return on which it was carried over prior to the 1974 return. As noted above (note 10), this is of no help to petitioner.

